Alex R. Straus, Esq. (SBN 321366)
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive, PH Suite
Beverly Hills, CA 90212
Telephone: (866) 252-0878
Facsimile: (865) 522-0049
astraus@milberg.com

*Attorney for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| DAVID WRAY, JAMAHL FARRINGTON, MATTHEW BURROW, and NIKOLAS PULLEN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HUMBLE BUNDLE, INC.,<br><br>Defendant. | Case No.: 3:25-cv-01592<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs David Wray ("Plaintiff Wray"), Jamahl Farrington ("Plaintiff Farrington"), Matthew Burrow ("Plaintiff Burrow"), and Nikolas Pullen ("Plaintiff Pullen," and with Plaintiff Wray, Plaintiff Farrington, and Plaintiff Burrow, collectively, "Plaintiffs"), individually and on behalf of all other similarly situated persons, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

**NATURE OF THE ACTION**

1.      This is a class action brought on behalf of all persons with Facebook accounts who purchased video games through humblebundle.com.

2.     Humble Bundle, Inc. ("Humble Bundle") is an online video game retailer that operates through its website, humblebundle.com (the "Website"). The platform offers bundles of video games, software, and other digital content, while also selling individual video games and a subscription service featuring monthly game selections.

3.     To solicit additional purchases, Humble Bundle knowingly collects and discloses its purchasers' personally identifiable information—including a record of every video game purchased—to Facebook without proper consent.

4.     The Video Privacy Protection Act ("VPPA") generally prohibits the knowing disclosure of a customer's video rental or sale records without the informed, written consent of the customer in a form "distinct and separate from any form setting forth other legal or financial obligations." 18 U.S.C. § 2710(b)(2)(B)(i).

5.     In 1988, Congress enacted the VPPA aiming to confer to consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

6.     Humble Bundle violated, and continues to violate, the VPPA through its practice of knowingly disclosing to a third party, Meta Platforms, Inc. ("Facebook"), data containing Plaintiffs' and putative class members' personally identifiable information ("PII") and Facebook ID ("FID")—including a record of purchase of every video game featuring in-game videos (including "cutscenes," *i.e.*, pre-recorded video included within a video game)—without first providing clear and conspicuous notice to the account holders and receiving consent.

## **PARTIES**

7.     Plaintiff David Wray is, and has been at all relevant times, a resident of Newport News, Virginia.

8.     Plaintiff Jamahl Farrington is, and has been at all relevant times, a resident of Deerfield Beach, Florida.

PLAINTIFFS' CLASS ACTION COMPLAINT

9.     Plaintiff Matthew Burrow is, and has been at all relevant times, a resident of Danbury, Connecticut.

10.    Plaintiff Nikolas Pullen is, and has been at all relevant times, a resident of Grand Rapids, Michigan.

11.    Defendant Humble Bundle, Inc. is a Delaware Corporation with an office at 163 Freelon St., San Francisco, CA 94107. Defendant develops, owns, and operates humblebundle.com, which is used throughout California and the United States.

## JURISDICTION

12.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over this action because it arises under the law of the United States, specifically the Video Privacy Protection Act, 18 U.S.C. § 2710.

13.    This Court has personal jurisdiction over the parties because Defendant has continuously and systematically conducted business in the State of California. Likewise, Plaintiffs' rights were violated in the State of California as a result of their contact with Defendant from and within California.

14.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district. Moreover, venue is also proper in this Court because the Humble Bundle Terms of Service, located on its Website, state that "you hereby consent to the exclusive jurisdiction of and venue in the federal and state courts located in San Francisco, California, U.S.A. in all disputes arising out of or relating to" purchases made through the Humble Bundle Website.

## INTRADISTRICT ASSIGNMENT

15.    Pursuant to Civil Local Rules 3-2(c-d), a substantial part of the events giving rise to the claims herein arose in San Francisco County, California and this action should be assigned to the San Francisco Division.

PLAINTIFFS' CLASS ACTION COMPLAINT

## FACTUAL BACKGROUND

### A.    The Video Privacy Protection Act.

16.    Initially passed in 1988, the VPPA was designed to protect the privacy of individuals and their families by preventing unauthorized disclosure of their video rental, purchase, and viewing history. In proposing the Video and Library Privacy Protection Act, later codified as the VPPA, Senator Leahy stated that "[i]n practical terms our right to privacy protects the choice of movies that we watch with our family in our own homes. And it protects the selection of books that we choose to read." 134 CONG. REC. S5399 (daily ed. May 10, 1988). Thus, the personal nature of such information and the necessity to protect it from disclosure is the inspiration of the statute: "[t]hese activities are at the core of any definition of personhood. They reveal our likes and dislikes, our interests, and our whims. They say a great deal about our dreams and ambitions, our fears and our hopes. They reflect our individuality, and they describe us as people." *Id.*

17.    While these statements rang true in 1988, when the VPPA was passed, the importance of legislation like the VPPA is more pronounced today, in the era of data mining from online activities.

18.    In 2012, Congress amended the VPPA and, in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

19.    During a 2012 Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy emphasized the point by stating: "While it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps, and other new technologies have revolutionized the availability of Americans' information."[1]

---

[1] *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century: Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary*, 112th Cong. 1 (2012), https://www.judiciary.senate.gov/meetings/the-video-privacy-protection-act-protecting

PLAINTIFFS' CLASS ACTION COMPLAINT

20.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

21.     The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

22.     A videotape service provider ("VTSP") is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4). A consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

23.     The VPPA also prohibits the disclosure of PII, which identifies the title or description of the audio visual material for marketing goods and services. 18 U.S.C. § 2710(b)(2)(D)(ii).

24.     VTSPs may obtain consent from consumers to disclose information where that consent: (1) is in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer; (2) at the election of the consumer in advance of up to 2 years or when the disclosure is sought; and (3) if the VTSP provided the consumer with a clear and conspicuous opportunity to withdraw consent on a case-by-case basis or withdraw from ongoing disclosures at the consumer's election. 18 U.S.C. § 2710(b)(2)(B)(i)–(iii).

25.     Under the statute, for each violation, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

26.     Humble Bundle is a VTSP that sold or provided access to pre-recorded audio-visual materials to PII Users, including Plaintiffs and Class Members, on its website.

---

-viewer-privacy-in-the-21s-century (last visited Dec 17, 2024).

PLAINTIFFS' CLASS ACTION COMPLAINT

**B.    The VPPA and Video Games.**

27.    The VPPA covers "prerecorded video cassette tapes or similar audio visual materials," *see* 18 U.S.C. § 2710(a)(4), and Congress intended that to include a broad category of audio visual materials, including "laser discs, open-reel movies, or CDI technology" *see* S. Rep. 100-599), digitally streamed "video clips[,]" and video game cutscenes. *See Aldana v. GameStop, Inc.*, 2024 U.S. Dist. LEXIS 29496, at *17-18, 19 (S.D.N.Y. Feb. 21, 2024).

28.    Video games have contained "cut scenes"[2] since the 1980s—possibly even earlier—and are designed to "keep players immersed in the game world by allowing them to follow a clear narrative."[3]

29.    "Narrative storytelling has become more and more common in video games . . . [and] [u]sing cinematic techniques and principles has helped game developers enhance gameplay experience for these kinds of games."[4]

30.    For decades, the video game industry has harmonized interactive digital entertainment and pre-recorded video, combining both as definitive elements of nearly all video games. For instance, in 1991, Philips introduced the Philips CD-i 910, which "play[ed] cinema-quality computer games, educational programs, movies and other multimedia products that combine video, audio and text features in an interactive rather than a play-only mode."[5] Three years later, in Japan (and the following year in the United States), Sony introduced the "PlayStation" console, which used a CD-ROM drive to "play videogames as well as other forms of interactive entertainment, as was considered important at the time." [6] These technologies and others like them have blurred the lines between video games and cinema, regardless of the

---

[2] Cutscenes, also called cinematics, full motion videos, or interactive events, exist in several formats, including live-action video, pre-rendered cut scenes, and real-time cut scenes. Each method makes use of pre-scripted events, and audio and video materials stored within a game's files. *See* David 'Ryatta' Wyatt, *The Art of Cutscenes*, INMOTION GAMING, http://www.inmotiongaming.com/the-art-of-cutscenes/ (last visited Dec. 17, 2024).

[3] *Game Development Meets Filmmaking: Cinematography in Video Games*, ACAD. OF ART UNIV. BLOG (Feb. 21, 2020), https://blog.academyart.edu/game-development-meets-filmmaking-cinematography-in-video-games/.

[4] *Id.*

[5] Patrick Oster, *Philips's Multimedia Makeover; Dutch Electronics Firm Escapes Crisis, but Can It Compete Globally?*, WASH. POST (Oct. 26, 1994), https://tinyurl.com/4xwnausj.

[6] *Id.*

6

PLAINTIFFS' CLASS ACTION COMPLAINT

physical media video games are stored or transmitted in (i.e., video games distributed through direct download on modern video game consoles or computers).

### C.    The Meta Tracking Pixel.

31.    Facebook is the largest social networking site, with approximately 3.0 billion monthly active users.[7] Facebook's policy requires users to go by "the name they usually go by" to sign up as a user.[8] To that end, users are required to provide their first and last name, birthday, gender, and mobile number or email.[9] Facebook surveils its users' activity both on and off its site, allowing it to make inferences about users beyond what they explicitly disclose to the website.[10] Facebook uses this data to advertise products and services to its users.

32.    Facebook generates the bulk of its revenue by selling targeted advertising space on its website.[11] Advertisers are able to use precise filters and parameters for their targeted advertisements based on the information collected by Facebook. Facebook uses website or app traffic to allow advertisers to build "Custom Audiences" to reach "people who already know [their] business."[12] Through Custom Audiences, advertisers can target existing customers directly, or they can use it to build a "lookalike audience," which "leverages information such as demographics, interests, and behavior from [their] source audience to find new people who share similar qualities."[13]

---

[7] *Facebook has 3 Billion Users. Many of Them are old,* CBS NEWS (May 8, 2023) https://www.cbsnews.com/news/facebook-users-3-billion-users-zuckerberg/.
[8] Meta Transparency Center, *Authentic Identity Representation*, META, https://transparency.meta.com/policies/community-standards/authentic-identity-representation (last visited Dec. 17, 2024).
[9] Facebook, *Sign Up*, META, https://www.facebook.com/ (last visited Dec. 17, 2024).
[10] Business Help Center, *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Dec. 17, 2024).
[11] Mike Isaac, *Facebook's Profit Surges 101 Percent on Strong ad Sales.*, N.Y. Times, July 28, 2021, https://www.nytimes.com/2021/07/28/business/facebook-q2-earnings.html.
[12] Business Help Center, *About Custom Audiences*, META, https://www.facebook.com/business/help/744354708981227?id=2469097953376494 (last visited Dec. 17, 2024).
[13] Business Help Center, *About Lookalike Audiences*, META, https://www.facebook.com/business/help/164749007013531?id=401668390442328 (last visited Dec. 17, 2024).

PLAINTIFFS' CLASS ACTION COMPLAINT

33. Custom Audiences require an advertiser to supply the underlying data to Facebook. They can do so through two mechanisms: manually uploading contact information for customers or utilizing one of Facebook's business tools, such as Meta Pixels.[14]

34. Meta Pixels are codes that advertisers can integrate into their websites. Once integrated, the Meta Pixel "tracks the people and types of actions they take" while on the advertiser's website.[15] The Meta Pixel can be configured to automatically collect IP addresses, information about the web browser, and the person using the website.[16] When the Meta Pixel captures an action, it sends a record to Facebook. Once this record is received, Facebook processes, analyzes, and assimilates it into its datasets.

### D. Facebook ID.

35. Facebook ID ("FID") is a unique and persistent identifier that Facebook assigns to each user. A FID is personally identifiable information. Anyone can identify a Facebook profile—and all personal information publicly listed on that profile—by appending the Facebook ID to the end of "www.Facebook.com." As Facebook itself explains, any ordinary person can look up the user's Facebook profile and name by using the FID:[17]

**User ID**

Your User ID is a string of numbers that doesn't personally identify you but does connect to your Facebook profile. You have a User ID automatically, whether or not you choose to create a username. Learn how to find your user ID.

User IDs can:

- Allow someone with the ID to see your profile, including any public information. Learn how to adjust what people can see in your profile.

- Help other applications personalize your experience by connecting with your Facebook account. When you allow apps to connect with your Facebook account, they can use your user ID to see public information, like your public profile and your friend list.

- When you run into issues with an app or game, your User ID can help the developer better investigate the problem to understand and address your specific concerns.

---

[14] Business Help Center, *Create a Customer List Custom Audience*, META, https://www.facebook.com/business/help/170456843145568?id=2469097953376494 (last visited Dec. 17, 2024).
[15] Facebook Business, *How Does Retargeting Help Your Business*, META, https://www.facebook.com/business/goals/retargeting (last visited Dec. 17, 2024).
[16] Meta for Developers, *Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel (last visited Dec. 17, 2024).
[17] Facebook Help Center, *Your Username*, META, https://www.facebook.com/help/1740158369563165 (last visited Dec. 17, 2024).

PLAINTIFFS' CLASS ACTION COMPLAINT

36.    When a Facebook subscriber purchases a video game on Humble Bundle's Website, the title of the video game, the URL, and the subscriber's FID are transmitted to Facebook through the Meta Tracking Pixel. Below is an example of the process for purchasing the video game titled *The Dark Pictures Anthology – The Devil in Me* on the Humble Bundle Website:



37.    By compelling a user's Internet browser to disclose data relating to video games, Humble Bundle knowingly discloses information that sufficiently allows an ordinary person to identify what video games a specific individual has purchased.

38.    The aforementioned allows Humble Bundle to optimize its ads and build Custom Audiences for future ads. This transmission is not the subscriber's decision, but results from Humble Bundle's use and incorporation of the Meta Tracking Pixel into its Website.

39.    Notably, Humble Bundle could easily program its Website to prevent its account holders' user data and PII from being automatically transmitted to Facebook when an account holder uses its Website. However, it is not in Humble Bundle's financial interest to do so because

PLAINTIFFS' CLASS ACTION COMPLAINT

it benefits financially by providing this highly sought-after information to Facebook and other third parties. As a result of its data compiling and sharing practices, Humble Bundle has knowingly disclosed to Facebook its account holders' PII and personal video viewing information in violation of the VPPA.

40.    Humble Bundle maintains a vast digital database comprised of its account holders' user data and PII, including the email addresses of each account holder and information reflecting the video game content each of its account holders purchased. The data that Humble Bundle discloses to Facebook is also tied to the account holders' unique FID. This allows Facebook to build from scratch or add to the trove of data it already has in its detailed profiles of its users. Importantly, this disclosure is made without the consent of Humble Bundle's account holders and to the detriment of the account holders' legally protected privacy rights.

41.    Additionally, upon information and belief, Humble Bundle also uploads customer lists to Facebook that contain subscribers' email addresses and purchase information, including what video games they purchased. Upon information and belief, Humble Bundle uploads these lists for the purpose of Facebook matching Humble Bundle's users to their Facebook profiles. Upon information and belief, these customer lists must contain identifiers such as email, phone number, and address, which Facebook then matches to Facebook profiles so that advertisers can advertise to their customers on Facebook and Meta's other social media platforms.

**E.    Humble Bundle Account Sign-Up Process and Privacy Policy.**

42.    As explained *supra*, Humble Bundle is an online platform that sells bundles of video games, software, and other digital content, as well as offering individual games and a subscription service for monthly game selections. Humble Bundle monetizes its digital content by requiring customers to sign up for an account when purchasing video games or other content through its Website. To sign up on Humble Bundle's Website, a customer must provide their email address and create a password.

43.    Notably, once account holders sign in and purchase digital content on Humble Bundle's Website, they are not notified in a manner that complies with the VPPA that their user data and PII are being shared with third parties. Humble Bundle does not provide its account

1  holders with an opportunity, in a clear and conspicuous manner, to withdraw on a case-by-case

2  basis from the ongoing disclosure of their user data and PII.

3      44.    Upon clicking the "Sign Up" button, a user is directed to provide an email address

4  and create a password. Prior to clicking the blue "Sign Up" button at the bottom of the page, there

5  is an acknowledgment that, by signing up, the user confirms they are 13 years of age or older and

6  agrees to Humble Bundle's Terms & Conditions and Privacy Policy. Once the user clicks the blue

7  "Sign Up" button, they may proceed to browse the platform without additional steps to verify

8  their account.

9      45.    Once an account holder selects a game or other digital content to purchase, they

10 are prompted to enter their payment information. After completing this step, the user can finalize

11 the purchase. When checking out, Humble Bundle's Privacy Policy Terms, located at

12 https://www.humblebundle.com/privacy, are not disclosed "in a form distinct and separate from

13 any form setting forth other legal or financial obligations of its [subscribers]" and do not obtain

14 consent to share Humble Bundle account holders' user data and PII with third parties. Therefore,

15 Humble Bundle's sign-up process does not provide reasonably conspicuous notice of the terms to

16 which the consumer will be bound.

17     46.    Although Humble Bundle's Privacy Policy acknowledges that it collects user data

18 and PII, this disclosure does not relieve Humble Bundle of liability under the VPPA. The VPPA

19 requires that any disclosure of such information comply with specific conditions outlined in 18

20 U.S.C. § 2710(b)(2), including obtaining the consumer's informed consent distinct from other

21 legal or financial obligations. Humble Bundle's failure to provide notice and obtain such consent

22 at the time of disclosure or in advance for a period not exceeding two years violates the VPPA.

23          **F.    Experience of Plaintiff David Wray.**

24     47.    Plaintiff Wray had an account with Humble Bundle within the past 2 years, and it

25 was through this account that Plaintiff Wray purchased video games on the Humble Bundle

26 Website. Plaintiff Wray became an account holder of Humble Bundle by providing, amongst other

27 things, his email address and credit card information (or other similar payment information).

28

48.    Plaintiff Wray had a Facebook account at all relevant times, including at the time he purchased a video game from Humble Bundle. Proof of Plaintiff Wray's Facebook account is attached to this demand as **EXHIBIT A**.

49.    Plaintiff Wray purchased the video game bundle "Destiny 2: The Story So Far" on the Humble Bundle Website using his Humble Bundle account. Below is an image hosted on the Humble Bundle Website during sale of "Destiny 2: The Story So Far" in 2024:



Proof of Plaintiff Wray's purchase on Humble Bundle's Website is attached herein as **EXHIBIT B**. The content identified in **EXHIBIT B** and purchased by Plaintiff Wray on the Humble Bundle Website contain(s) cutscenes.

50.    "Destiny 2" and its related content is one of the most famous video games in the world and has been since its launch/release. Indeed, the original "Destiny" video game helped coin the term "looter shooter," which is now considered a genre of video games.

51.    "Destiny 2" is the name of a video game and <u>not</u> a video game series with individual titles within it, and the name "Destiny 2" also identifies all of the downloadable content included within the "Destiny 2: The Story So Far" bundle sold by Humble Bundle. Insofar as there is a "Destiny" video game series, the individual titles within the series are "Destiny" and "Destiny 2."

PLAINTIFFS' CLASS ACTION COMPLAINT

52.    To be clear, downloadable content is/are video games with each downloadable content an addition to the larger video game "Destiny 2."

53.    The downloadable content for the video game "Destiny 2" included within the "Destiny 2: The Story So Far" bundle sold by Humble Bundle includes: "Destiny 2: Lightfall," "Destiny 2: The Witch Queen," "Destiny 2: Beyond Light," "Destiny 2: Bungie 30th Anniversary Pack," and "Destiny 2: Forsaken Pack." Indeed, even Humble Bundle itself admits that these titles are downloadable content ("DLC") for the "Destiny 2" video game, as the screenshot below from the 2025 sale of a similar "Destiny 2" bundle reveals:



54.    As discussed more fully *infra* at Count I, Humble Bundle transmitted to Meta the titles of video games purchased by its users, including the purchase by Plaintiff Wray of downloadable content for the video game "Destiny 2."

55.    Plaintiff Wray was unaware that Humble Bundle harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in Humble Bundle's Website without proper disclosure or obtaining required consent as mandated by the VPPA.

56.    Plaintiff Wray had a reasonable expectation of privacy that his user data and PII would not be harvested from the Humble Bundle Website or shared with third parties such as Facebook.

57.    Plaintiff Wray never consented, agreed, authorized, or permitted Humble Bundle to disclose his user data or PII to Facebook. Plaintiff Wray has never been provided with written

notice appropriate under the VPPA that Humble Bundle discloses its account holders' user data. Humble Bundle nonetheless knowingly disclosed Plaintiff Wray's user data in a fashion that violates the VPPA and other law.

**G.      Experience of Plaintiff Jamahl Farrington.**

58.      Plaintiff Farrington, had an account with Humble Bundle within the past 2 years, and it was through this account that Plaintiff Farrington purchased video games on the Humble Bundle Website. Plaintiff Farrington became an account holder of Humble Bundle by providing, amongst other things, his email address and credit card information (or other similar payment information).

59.      Plaintiff Farrington had a Facebook account at all relevant times, including at the time he purchased a video game from Humble Bundle. Proof of Plaintiff Farrington's Facebook account is attached to this demand as **EXHIBIT C**.

60.      Plaintiff Farrington purchased the video game "Dragon's Dogma 2" on the Humble Bundle Website using his Humble Bundle account. Proof of Plaintiff Farrington's purchase on Humble Bundle's Website is attached herein as **EXHIBIT D**. The video game identified in **EXHIBIT D** and purchased by Plaintiff Farrington contains cutscenes.

61.      As discussed more fully *infra* at Count I, Humble Bundle transmitted to Meta the titles of video games purchased by its users, including the purchase by Plaintiff Farrington of the video game "Dragon's Dogma 2."

62.      Plaintiff Farrington was unaware that Humble Bundle harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in Humble Bundle's Website without proper disclosure or obtaining required consent as mandated by the VPPA. Plaintiff Farrington had a reasonable expectation of privacy that his user data and PII would not be harvested from the Humble Bundle Website or shared with third parties such as Facebook.

63.      Plaintiff Farrington never consented, agreed, authorized, or permitted Humble Bundle to disclose his user data or PII to Facebook. Plaintiff Farrington has never been provided with written notice appropriate under the VPPA that Humble Bundle discloses its account holders'

user data. Humble Bundle nonetheless knowingly disclosed Plaintiff Farrington's user data in a fashion that violates the VPPA and other law.

**H.    Experience of Plaintiff Matthew Burrow.**

64.    Plaintiff Burrow, had an account with Humble Bundle within the past 2 years, and it was through this account that Plaintiff Burrow purchased video games on the Humble Bundle Website. Plaintiff Burrow became an account holder of Humble Bundle by providing, amongst other things, his email address and credit card information (or other similar payment information).

65.    Plaintiff Burrow had a Facebook account at all relevant times, including at the time he purchased a video game from Humble Bundle. Proof of Plaintiff Burrow's Facebook account is attached to this demand as **EXHIBIT E**.

66.    Plaintiff Burrow purchased the video game "Chrono Trigger" on the Humble Bundle Website using his Humble Bundle account. Proof of Plaintiff Burrow's purchase on Humble Bundle's Website is attached herein as **EXHIBIT F**. The video game identified in **EXHIBIT F** and purchased by Plaintiff Burrow contains cutscenes.

67.    As discussed more fully *infra* at Count I, Humble Bundle transmitted to Meta the titles of video games purchased by its users, including the purchase by Plaintiff Burrow of the video game "Chrono Trigger."

68.    Plaintiff Burrow was unaware that Humble Bundle harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in Humble Bundle's Website without proper disclosure or obtaining required consent as mandated by the VPPA. Plaintiff Burrow had a reasonable expectation of privacy that his user data and PII would not be harvested from the Humble Bundle Website or shared with third parties such as Facebook.

69.    Plaintiff Burrow never consented, agreed, authorized, or permitted Humble Bundle to disclose his user data or PII to Facebook. Plaintiff Burrow has never been provided with written notice appropriate under the VPPA that Humble Bundle discloses its account holders' user data. Humble Bundle nonetheless knowingly disclosed Plaintiff Burrow's user data in a fashion that violates the VPPA and other law.

1

**I.    Experience of Plaintiff Nikolas Pullen.**

2    70.    Plaintiff Pullen had an account with Humble Bundle within the past 2 years, and it

3    was through this account that Plaintiff Burrow purchased video games on the Humble Bundle

4    Website. Plaintiff Pullen became an account holder of Humble Bundle by providing, amongst

5    other things, his email address and credit card information (or other similar payment information).

6    71.    Plaintiff Pullen had a Facebook account at all relevant times, including at the time

7    he purchased a video game from Humble Bundle. Proof of Plaintiff Pullen's Facebook account is

8    attached herein as **EXHIBIT G**.

9    72.    Plaintiff Pullen purchased the bundle of video games contained within the

10    "S.T.A.L.K.E.R.: BUNDLE" on the Humble Bundle Website using his Humble Bundle account.

11    73.    The acronym "S.T.A.L.K.E.R." stands for "scavangers, trespassers, adventures,

12    loners, killers, explorers, and robbers" and is tattooed on the arm of the protagonist of the first

13    game in the series. As such, even standing alone, the acronym "S.T.A.L.K.E.R." identifies the

14    "S.T.A.L.K.E.R." video game series and all of its individual titles, especially given the series'

15    notoriety as a game series developed in war-torn Ukraine with a recent sequel, "S.T.A.L.K.E.R.

16    2: Heart of Chornobyl." Even Humble Bundle makes reference on the Humble Bundle Website to

17    S.T.A.L.K.E.R. games being developed in Ukraine (*see* fn. 18, *infra*), which has added to the

18    series' fame as a result of the Russian Federation's real world invasion and its impact upon the

19    development and release of "S.T.A.L.K.E.R. 2: Heart of Chornobyl." Moreover, the U.S.

20    Trademark Office has allowed the registration of "S.T.A.L.K.E.R." trademarks for the series'

21    video games and products precisely because of their inherently unique quality, as shown below

22    from the U.S. Trademark Office's online records:

23

24

25

26

27

28

PLAINTIFFS' CLASS ACTION COMPLAINT





74.    The video games within the "S.T.A.L.K.E.R.: BUNDLE" sold by Humble Bundle are "S.T.A.L.K.E.R.: Shadow of Chernobyl," "S.T.A.L.K.E.R.: Clear Sky," and "S.T.A.L.K.E.R.: Call of Pripyat." Below is an image[18] hosted on the Humble Bundle Website of the "S.T.A.L.K.E.R.: BUNDLE":



75.    Proof of Plaintiff Pullen's purchase on Humble Bundle's Website is attached to this demand as **EXHIBIT H**. The video games included in the "S.T.A.L.K.E.R.: BUNDLE" and purchased by Plaintiff Pullen each contain cutscenes.

---

[18]    *See*    https://www.humblebundle.com/store/stalker-bundle?srsltid=AfmBOooIO4WRqgmwlZlb 3Y0BqtAPKjUU1DktxYCLVG2021z-m90YEfmS (last accessed February 10, 2025), and also stating "S.T.A.L.K.E.R.: Bundle is a collection of three highly rated PC-games from Ukrainian studio GSC Game World."

PLAINTIFFS' CLASS ACTION COMPLAINT

76.     The specific video games included in the "S.T.A.L.K.E.R.: BUNDLE" can be easily identified/ascertained by any ordinary person as a mere Internet search easily reveals same, and as discussed *supra*, the unique acronym "S.T.A.L.K.E.R." by itself also identifies the specific series of video games. Additionally, the "S.T.A.L.K.E.R.: Bundle" is still on sale on the video game platform Steam,[19] and the bundle contains the same games sold by Humble Bundle as part of the "S.T.A.L.K.E.R.: Bundle."

77.     As discussed more fully *infra* at Count I, Humble Bundle transmitted to Meta the titles of video games purchased by its users, including the purchase by Plaintiff Pullen of "S.T.A.L.K.E.R." video games.

78.     Plaintiff Pullen was unaware that Humble Bundle harvested and shared his user data and PII with Facebook because the Meta Pixel software is inconspicuously embedded in Humble Bundle's Website without proper disclosure or obtaining required consent as mandated by the VPPA. Plaintiff Pullen had a reasonable expectation of privacy that his user data and PII would not be harvested from the Humble Bundle Website or shared with third parties such as Facebook.

79.     Plaintiff Pullen never consented, agreed, authorized, or permitted Humble Bundle to disclose his user data or PII to Facebook. Plaintiff Pullen has never been provided with written notice appropriate under the VPPA that Humble Bundle discloses its account holders' user data. Humble Bundle nonetheless knowingly disclosed Plaintiff Pullen's user data in a fashion that violates the VPPA and other law.

**J.     Humble Bundle's Arbitration Agreement.**

80.     Humble Bundle's Arbitration Agreement is contained within the company's Terms of Service and is part of a standardized clickwrap contract that users are required to accept in full as a requirement of using the Website.

81.     Users have no opportunity to negotiate, modify, or waive specific provisions of the Terms of Service, including the Arbitration Agreement. The Terms are presented in a "one-size-fits-all" fashion, with no room for individualized negotiation.

---

[19] *See* https://store.steampowered.com/sub/35983/ (last accessed February 10, 2025).

PLAINTIFFS' CLASS ACTION COMPLAINT

82.    Humble Bundle's Terms of Service contain layers of roadblocks designed to deter would-be claimants from presenting meritorious claims to an arbitrator. The Arbitration Agreement is structured in a way that places undue burdens on users, making it significantly more difficult for them to assert and resolve claims arising under the corresponding Terms of Service.

83.    The Arbitration Agreement states that "[a]ny arbitration under this Agreement will take place on an individual basis; class arbitrations and class actions are not permitted." As such, a reasonable consumer would understand these promises of "individual arbitration" to mean traditional, bilateral arbitration.

84.    However, in addition to a burdersome pre-arbitration notice requirement and 60-day dispute resolution process, the arbitration provision includes a mass filing provision that admits that claims may be delayed while other claims are resolved first.

85.    After promising "individual arbitration," Humble Bundle's Terms of Service abandon same and then add a complex, formal, multi-stage series of mass arbitration procedures, as set forth below:

> **(ix) Mass Filing :** If, at any time, 25 or more claimants (including you) submit Notices or seek to file demands for arbitration raising similar claims against the other party or related parties by the same or coordinated counsel or entities, consistent with the definition and criteria of Mass Filings ("Mass Filing") set forth in NAM's Mass Filing Supplemental Dispute Resolution Rules and Procedures ("NAM's Mass Filing Rules," available at https://www.namadr.com/resources/rules -fees-forms/, you and we agree that the additional procedures set forth below shall apply. The parties agree that throughout this process, their counsel shall meet and confer to discuss modifications to these procedures based on the particular needs of the Mass Filing. The parties acknowledge and agree that by electing to participate in a Mass Filing, the adjudication of their dispute might be delayed. Any applicable limitations period (including statute of limitations) and any filing fee deadlines shall be tolled beginning when the Mandatory Pre-Arbitration Notice and Informal Dispute Resolution Procedures are initiated, so long as the pre-arbitration Notice complies with the requirements in Section 13(2), until your claim is selected to proceed as part of a staged process or is settled, withdrawn, otherwise resolved, or opted out of arbitration.
>
> **Stage One :** Counsel for the claimants and counsel for Humble Bundle shall each select 25 claims per side (50 claims total) to be filed and to proceed in individual arbitrations as part of a staged process. Each of these individual arbitrations shall be assigned to a different, single arbitrator unless the parties agree otherwise in writing. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. After this initial set of staged proceedings is completed, the parties shall promptly engage in a global mediation session of all remaining claims

with a retired federal or state court judge and Humble Bundle shall pay the mediator's fee.

**Stage Two :** If the remaining claims are not resolved at this time, counsel for the claimants and counsel for Humble Bundle shall each select 50 claims per side (100 claims total) to be filed and to proceed in individual arbitrations as part of a second staged process, subject to any procedural changes the parties agreed to in writing. Each of these individual arbitrations shall be assigned to a different, single arbitrator unless the parties agree otherwise in writing. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. After this second set of staged proceedings is completed, the parties shall promptly engage in a global mediation session of all remaining claims with a retired federal or state court judge and Humble Bundle shall pay the mediator's fee.

**Stage Three :** If the remaining claims are not resolved at this time, counsel for the claimants and counsel for Humble Bundle shall each select 100 claims per side (200 claims total) to be filed and to proceed in individual arbitrations as part of a third staged process, subject to any procedural changes the parties agreed to in writing. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. Following this third set of staged proceedings, counsel for claimants may elect to have the parties participate in a global mediation session of all remaining claims with a retired federal or state court judge.

**Stage Four :** If your claim is not resolved at this time, then you agree that your claim will be resolved as part of continuing, staged individual arbitration proceedings as set forth below. Assuming the number of remaining claims exceeds 100, then 100 claims shall be randomly selected (or selected through a process agreed to by counsel for the parties) to be filed and to proceed in individual arbitrations as part of a staged process. If the number of remaining claims is fewer than 100, then all of those claims shall be filed and proceed in individual arbitrations. Any remaining claims shall not be filed or be deemed filed in arbitration, nor shall any arbitration fees be assessed in connection with those claims unless and until they are selected to be filed in individual arbitration proceedings as part of a staged process. After each set of 100 claims are adjudicated, settled, withdrawn, or otherwise resolved, this process shall repeat consistent with these parameters. Counsel for the parties are encouraged to meet and confer, participate in mediation, and engage with each other and with NAM (including through a Procedural Arbitrator) to explore ways to streamline the adjudication of claims, increase the number of claims to proceed at any given time, promote efficiencies, conserve resources, and resolve the remaining claims.

86.    The mass filing provision contains four stages and is triggered when 25 or more users submit related arbitration claims through the same counsel. This provision limits the number of cases that can be arbitrated simultaneously, restricting the arbitration process to 25 cases per side as part of the initial stage and then severely delaying the resolution of other claims.

PLAINTIFFS' CLASS ACTION COMPLAINT

87.    The complex procedures of the mass filing provision conflict not only with Humble Bundle's multiple promises of "individual arbitration," but also with the basic premise of arbitration itself. The informality of an individual, bilateral arbitration procedure is the chief advantage of "arbitration," as that term is used in the Federal Arbitration Act. For instance, the U.S. Supreme Court has held that a "switch" away from bilateral arbitration "sacrifices the principal advantage of arbitration—its informality—and makes the process slower, more costly, and more likely to generate procedural morass than final judgment. 'In bilateral arbitration, parties forgo the procedural rigor and appellate review of the courts in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialized disputes.'" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 348 (2011) (internal citation omitted).

88.    By repeatedly promising "individual arbitration," Humble Bundle dangles the carrot of informality, speed, and efficiency in front of claimants hoping to resolve their claims. But much later in its Terms, Humble Bundle completely abandons the informality of bilateral arbitration by creating a convoluted, multi-stage procedure, adding more layers of complexity than would exist in ordinary litigation. This trickery adds to the substantive unconscionability of Humble Bundle's mass filing provision.

89.    The limitation on the number of cases arbitrated at once causes delays in resolving individual claims, creating an environment where users are discouraged from pursuing claims due to the extended timeframes and uncertainty about the timely resolution of their disputes. The mass filing provision even states that remaining claims beyond the initial 25 in the first stage "shall not be filed or be deemed filed in arbitration."

90.    Moreover, after the initial stage of arbitration, the mass filing provision mandates mediation before other claims may be prosecuted, and even then, stage two limits the number of claims to 50 per side, the third to 100 per side, and then random selection of 100 cases to proceed individually as part of the fourth stage.

91.    Additionally, the class action waiver in the corresponding arbitration provision prevents users from pursuing their claims collectively, forcing them to resolve disputes

individually and through the convoluted multi-stage arbitration process. This, when combined with the mass filing provision, further disadvantages users with small claims, as in VPPA cases, the costs of arbitration exceed the potential recovery, leaving users with no viable means to seek redress. As a result, users are effectively discouraged from pursuing their claims.

92.    The Arbitration Agreement in Humble Bundle's Terms of Service is unconscionable as a matter of law.

## CLASS ALLEGATIONS

93.    Plaintiffs bring this action, on behalf of themselves and all others similarly situated, as a class action pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), and/or (b)(3):

> **Class Definition:** Plaintiffs seek to represent the following Class (members of which are collectively referred to herein as "Class Members"): During the fullest period allowed by law, all natural persons in the United States who had a Facebook account and purchased video games or other audiovisual content from humblebundle.com during the time the Meta Tracking Pixel was active on humblebundle.com, until the date notice is disseminated.

94.    Excluded from the Class are Defendant, its employees, agents and assigns, any members of the judiciary to whom this case is assigned, their respective court staff, the members of their immediate families, and Plaintiffs' counsel.

95.    Subject to additional information obtained through further investigation and discovery, the above-described Class may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

96.    This action has been brought and may be properly maintained as a class action under Federal Rule of Civil Procedure 23 because there is a well-defined community of interest in the litigation, the proposed Class is easily ascertainable, and Plaintiffs are proper representatives of the Class.

97.    **Numerosity:** At this time, Plaintiffs do not know the exact number of Members of the aforementioned Class. However, given the popularity of and user activity on Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all Members is impractical.

98.    **Typicality:** Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, purchased video games from Humble Bundle and had their PII collected and disclosed by Defendant.

99.    **Commonality:** Common questions of fact and law exist for all Class Members and predominate over the questions affecting only individual Members of the Class. With respect to the Class Members, these common questions include but are not limited to:

(a)    whether Defendant collected Plaintiffs' and the Class's video game-related information and PII;

(b)    whether Defendant unlawfully disclosed and continues to disclose its users' video game-related information and PII in violation of the VPPA;

(c)    whether Defendant's disclosures were committed knowingly; and

(d)    whether Defendant disclosed Plaintiffs' and the Class's video game-related information and PII without consent.

100.    **Adequacy of Representation:** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and corresponding state causes of action. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs can fairly and adequately represent and protect the interests of the Class. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent Members of the Class. Plaintiffs have raised viable statutory claims, or the type reasonably expected to be raised by Members of the Class, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Class, additional claims as may be appropriate, or to amend the definition of the Class to address any steps that Defendant took.

101.    **Superiority of the Class Action:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Members of the Class is impracticable. Even if every Member of the Class could afford to pursue individual litigation, the court system could not. It would be unduly burdensome

to the courts in which individual litigation of numerous cases would proceed. Individualized litigation would also present the potential for varying, inconsistent, or contradictory judgments and would magnify the delay and expense to all parties and the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and the court system, and protects the rights of each member of the Class. Plaintiffs anticipate no difficulty in managing this action as a class action.

**CAUSES OF ACTION**
**COUNT I**
**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710,** *et seq.*

102.    Plaintiffs hereby reallege paragraphs 1 through 101 above as if fully set forth herein.

103.    Plaintiffs bring this claim individually and on behalf of the proposed Class Members against Defendant.

104.    Defendant is a "video tape service provider" because it offers video games containing cutscenes and other pre-recorded audiovisual content for sale on its website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

105.    Plaintiffs and Members of the Class are "consumers" because they purchased video games. 18 U.S.C. § 2710(a)(1).

106.    Defendant disclosed to a third party—Facebook (Meta)—Plaintiffs' and putative Class Members' personally identifiable information. Defendant utilized the Facebook Tracking Pixel to compel Plaintiffs' web browser (and the web browsers of Class Members) to transfer Plaintiffs' (and Class Members') identifying information, like their Facebook ID, along with Plaintiffs' (and Class Members') event data, like the title of video games containing cutscenes

24

PLAINTIFFS' CLASS ACTION COMPLAINT

that were purchased by Plaintiffs (and Class Members) or the title of other pre-recorded audiovisual media that was/were also purchased by Class Members.

107.    Plaintiffs and the Class Members purchased video games containing cutscenes from Defendant, as well as other pre-recorded audiovisual media.

108.    Defendant knowingly disclosed Plaintiffs' and putative Class Members' personally identifiable information because it used that data to build audiences on Facebook to retarget them for its advertising campaigns.

109.    Plaintiffs and Class Members did not provide Defendant with any form of consent consistent with the VPPA—either written or otherwise—to disclose their PII to third parties.

110.    Defendant's aforementioned disclosures were not made in the "ordinary course of business," as the term is defined by the VPPA. Particularly, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

111.    On behalf of themselves and the Class, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Class by requiring the Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a)    for a determination that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure Rule 23(a), (b)(1), and/or (b)(3), or, in ther alternative, (c)(4) if appropriate;

(b)    for an order certifying the Class, naming Plaintiffs as representatives of the Class, and naming Plaintiffs' attorneys as Class Counsel to represent the Class;

(c)    for an order declaring that Defendant's conduct violates the statute(s) referenced herein;

PLAINTIFFS' CLASS ACTION COMPLAINT

(d)    for an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

(e)    an award of statutory damages to the extent available;

(f)    for punitive damages, as warranted, in an amount to be determined at trial;

(g)    for prejudgment interest on all amounts awarded;

(h)    for injunctive relief as pleaded or as the Court may deem proper; and

(i)    for an order awarding Plaintiffs and the Class their reasonable attorneys' fees and expenses and costs of suit.

## JURY DEMAND

Plaintiffs demand a trial by jury of all issues so triable.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury for all the claims asserted in this Complaint so triable.

PLAINTIFFS' CLASS ACTION COMPLAINT

Dated: February 14, 2025

/s/ Alex R. Straus
Alex R. Straus (SBN 321366)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
280 S. Beverly Drive, PH Suite
Beverly Hills, CA 90212
Telephone: (866) 252-0878
Facsimile:  (865) 522-0049
astraus@milberg.com

*Attorney for Plaintiffs*

PLAINTIFFS' CLASS ACTION COMPLAINT