**PERKINS COIE LLP**
James G. Snell (Bar No. 173070)
JSnell@perkinscoie.com
3150 Porter Drive
Palo Alto, California 94304-1212
Telephone: +1.650.838.4300
Facsimile: +1.650.838.4350

Lauren J. Tsuji (Bar No. 300155)
LTsuji@perkinscoie.com
Anna Thompson-Lanners (*Pro Hac Vice*)
AThompsonLanners@perkinscoie.com
1301 Second Avenue, Suite 4200
Seattle, Washington 98101-3804
Telephone: +1.206.359.8000
Facsimile: +1.206.359.9000

*Attorneys for Defendant Humble Bundle, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

DAVID WRAY, JAMAHL FARRINGTON, MATTHEW BURROW, and NIKOLAS PULLEN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HUMBLE BUNDLE, INC.,

Defendant.

Case No. 3:25-cv-01592

**DEFENDANT HUMBLE BUNDLE, INC.'S STATEMENT OF RECENT DECISION [CIV. L-R 7-3]**

Date: September 16, 2025
Time: 2:00 p.m.
Location: Courtroom 9, 19 Floor
Judge: Hon. Trina L. Thompson

Pursuant to Local Rule 7-3(d)(2) and in support of Defendant Humble Bundle, Inc.'s ("Humble Bundle") Motion to Compel Arbitration (Dkt. No. 32), Humble Bundle respectfully submits the following relevant judicial opinion published after Plaintiff's Opposition (Dkt. No. 36) and Humble Bundle's Reply (Dkt. No. 37) were filed with the Court. The judicial opinion is *Ziboukh, et al. v. Whaleco, Inc., et al.*, No. 24-cv-3733 (MKB), ---WL--- (E.D.N.Y. Aug. 14, 2025). A copy of the August 14, 2025, decision is attached hereto as **Exhibit A.**

DATED: August 21, 2025

**PERKINS COIE LLP**

By: *Lauren J. Tsuji*
James G. Snell (Bar No. 173070)
Lauren J. Tsuji (Bar No. 300155)
Anna Thompson-Lanners (*Pro Hac Vice*)

*Attorneys for Defendant Humble Bundle, Inc.*

# EXHIBIT A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

JEHAN ZIBOUKH, MARGRET PHILIE, VERA FIGLOCK, NICOLE MAY, TYANA DAUGHTERY, SOLALIZ HERNANDEZ, DEBRA KRYSTYN, I.E., A MINOR, CYNTHIA RODRIGUEZ, J.P., A MINOR, MIGUEL ACOSTA, VINSON MANGOS, NOAH KUPPER, J.P., A MINOR, CHRISTIAN VEGA, A.H., A MINOR, AND OLAYA BOURAKKADI AMRANI, *on behalf of themselves and others similarly situated*,

Plaintiffs,

v.

WHALECO, INC., *doing business as* TEMU, and PDD HOLDINGS INC., *formerly known as* PINDUODUO INC.,

Defendants.

---

**MEMORANDUM & ORDER**
24-CV-3733 (MKB)

MARGO K. BRODIE, United States District Judge:


I. Background ........ 4
 a. The parties ........ 4
 b. The Temu App's registration screen ........ 5
 c. The terms of use ........ 7
 d. Data collection on the Temu App ........ 10
 e. Procedural background ........ 12
II. Discussion ........ 13
 a. Standards of review ........ 13
  i. Motion to dismiss for lack of standing ........ 13
  ii. Motion to dismiss for lack of personal jurisdiction ........ 15
  iii. Motion to compel arbitration ........ 17
 b. The Non-Users fail to establish standing to pursue their claims ........ 19
 c. The Court lacks personal jurisdiction over the Users' and Minors' claims against PDD 24
  i. Specific jurisdiction ........ 27
  ii. General jurisdiction ........ 38

iii. Rule 4(k)(2) ... 40
iv. The Court grants Plaintiffs' request for jurisdictional discovery as to PDD ... 43
d. The Court grants Defendants' motion to compel arbitration of the Users' and Minors' claims against Temu ... 46
i. The Users and Minors executed a valid arbitration agreement ... 48
ii. Plaintiffs' remaining challenges to the arbitration agreement fail ... 55
iii. The Minor Users' claims can be arbitrated ... 61
iv. The Court denies Plaintiffs' request for discovery as to Temu's ability to compel arbitration ... 67
III. Conclusion ... 69

Plaintiffs Jehan Ziboukh, Margret Philie, Vera Figlock, Nicole May, Tyana Daughtery, Solaliz Hernandez, Debra Krystyn, I.E., a minor, Cynthia Rodriguez, J.P., a minor, Miguel Acosta, Vinson Mangos, Noah Kupper, J.P., a minor, Christian Vega, A.H., a minor, and Olaya Bourakkadi Amrani, commenced the above-captioned proposed class action on November 3, 2023, against Defendants Whaleco, Inc., doing business as Temu ("Temu"), and PDD Holdings Inc., formerly known as Pinduoduo Inc. ("PDD"). (Compl., Docket Entry No. 1.) Plaintiffs propose nationwide classes for Users, Minors, and Non-Users, and subclasses for state-based Users, Minors, and Non-Users. (Second Am. Compl. ("SAC") ¶ 253, Docket Entry No. 64.) Plaintiffs allege that Defendants violated the federal Computer Fraud and Abuse Act, 18 U.S.C. § 1030, the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2510 *et seq.*, and various state laws.[1] (*See* SAC.) In addition, Plaintiffs allege various common law tort claims,

[1] Plaintiffs allege that Defendants violated the California Comprehensive Data Access and Fraud Act, Cal. Penal Code § 502; the California False Advertising Law, Cal. Bus. & Prof. Code § 17500; the California Unfair Competition Law, *id.* § 17200; the California Invasion of Privacy Act, Cal. Penal Code §§ 630 *et seq.*; the Illinois Biometric Information Privacy Act, 740 Ill. Comp. Stat. 14/1; the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. Ann. 505/2; the right of privacy under the Massachusetts General Laws, Mass. Gen. Laws, ch. 214, § 1B; the Massachusetts Consumer Protection Act, Mass. Gen. Laws, ch. 93A *et seq.*; the Massachusetts Wiretap Act, Mass. Gen. Laws ch. 272, § 99; the Virginia Computer Crimes Act, Va. Code § 18.2-152.1; the New York General Business Law, N.Y. Gen. Bus. Law

including trespass to chattels, negligence, restitution/unjust enrichment, intrusion upon seclusion, conversion, and constitutional and tort claims under California law. (*See id.*)

On November 4, 2024, Defendants moved to (1) dismiss the Non-Users' claims for lack of standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure, and, in the alternative, for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, (2) dismiss all claims against PDD for lack of personal jurisdiction, and (3) compel arbitration of the Users' and Minors' claims; Plaintiffs opposed the motions.[2] For the reasons set forth below, the Court (1) grants Defendants' motion to dismiss the Non-Users' claims for lack of standing, (2)

---

§ 349; and the New York Civil Rights Law, N.Y. Civ. Rights Law § 51. (SAC ¶¶ 294–334, 375–92, 397–416, 440–75, 488–523.)

[2] (Defs.' Mot. to Dismiss ("Defs.' MTD"), Docket Entry No. 70; Defs.' Mem. in Supp. of Defs.' MTD ("Defs.' MTD Mem."), Docket Entry No. 71; Pls.' Opp'n to Defs.' MTD ("Pls.' MTD Opp'n"), Docket Entry No. 72; Defs.' Reply in Supp. of Defs.' MTD ("Defs.' MTD Reply"), Docket Entry No. 80; Defs.' Mot. to Compel Arbitration ("Defs.' MTC"), Docket Entry No. 75; Defs.' Mem. in Supp. of Defs.' MTC ("Defs.' MTC Mem."), Docket Entry No. 76; Pls.' Opp'n to Defs.' MTC ("Pls.' MTC Opp'n"), Docket Entry No. 78; Defs.' Reply in Supp. of Defs.' MTC ("Defs.' MTC Reply"), Docket Entry No. 81; Defs.' Notice of Suppl. Authority, Docket Entry No. 85; Pls.' Notice of Suppl. Authority, Docket Entry No. 86; Pls.' Suppl. Br. in Opp'n to Defs.' MTC ("Pls.' Suppl. MTC Opp'n"), Docket Entry No. 89; Defs.' Reply to Pls.' Suppl. MTC Opp'n, Docket Entry No. 90; Pls.' Second Notice of Suppl. Authority, Docket Entry No. 91.)

On July 9, 2025, Defendants moved to strike Plaintiffs' second notice of supplemental authority, and Plaintiffs opposed the motion to strike. (Defs.' Ltr. Mot. to Strike, Docket Entry No. 92; Pls.' Opp'n to Defs.' Ltr. Mot. to Strike, Docket Entry No. 93.) Defendants argue that Plaintiffs' supplemental material is irrelevant to this case and "simply point[s] the Court to allegations against Defendant Whaleco made in another plaintiff's lawsuit." (Defs.' Ltr. Mot. to Strike 1 (emphasis omitted).) The Court denies Defendants' motion to strike because motions to strike based "solely 'on the ground that the matter is impertinent and immaterial' are disfavored." *Brown v. Maxwell*, 929 F.3d 41, 51 n.42 (2d Cir. 2019) (emphasis omitted); *see also DeSimone v. Select Portfolio Servicing, Inc.*, No. 20-CV-3837, 2023 WL 6450236, at *4 (E.D.N.Y. Sept. 30, 2023) ("[I]t is fairly standard practice for parties to send letters or to otherwise file supplemental authority after briefing is complete." (quoting *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427, 2016 WL 4617159, at *7 (E.D.N.Y. Sept. 2, 2016))). In addition, Defendants requested that the Court direct Plaintiffs not to file further supplemental submissions without meeting and conferring with Defendants or obtaining leave of the Court. (Defs.' Ltr. Mot. to Strike 3.) Based on the filing of this opinion, the Court accordingly denies Defendants' request as moot.

denies Defendants' motion to dismiss the Users' and Minors' claims against PDD, and (3) grants Defendants' motion to compel arbitration of the Users' and Minors claims as to Temu.

## I. Background

### a. The parties

Plaintiffs are individuals located in various states including California, Illinois, Massachusetts, New Jersey, New York, and Virginia, who directly or indirectly interacted with Temu, a mobile application and online shopping platform in the United States that allows users to purchase low-cost goods manufactured in China (the "Temu App").[3] (SAC ¶¶ 1, 14–31.)

---

[3] The Court relies "solely on the pleadings — that is, the allegations of the Complaint and any exhibits attached to it" in deciding Defendants' motion to dismiss for lack of standing under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Lugo v. City of Troy*, 114 F.4th 80, 87 (2d Cir. 2024) (citing *Carter v. HealthPort Techs., Inc.*, 822 F.3d 47, 56 (2d Cir. 2016)); *New York v. U.S. Dep't of Agric.*, 454 F. Supp. 3d 297, 305–06 (S.D.N.Y. 2020) ("When a Rule 12(b)(1) motion is facial, *i.e.*, based solely on the allegations of the complaint or the complaint and exhibits attached to it (collectively the '[p]leading'), the plaintiff has no evidentiary burden. The task of the district court is to determine whether the [p]leading 'allege[s] facts that affirmatively and plausibly suggest that [the plaintiff] has standing to sue.'" (second and third alterations in original) (quoting *Carter*, 822 F.3d at 56–57)).

In addition, the Court relies on the pleadings, affidavits, and declarations in evaluating PDD's motion to dismiss for lack of personal jurisdiction. *See Johnson v. UBS AG*, 791 F. App'x 240, 241 (2d Cir. 2019) ("Courts may consider materials outside the pleadings on a motion to dismiss for lack of personal jurisdiction without converting it into a summary judgment motion."); *Minden Pictures, Inc. v. Grupo Televisa, S.A.B.*, 738 F. Supp. 3d 458, 467 (S.D.N.Y. 2024) (relying on the defendant's declaration in evaluating their motion to dismiss for lack of personal jurisdiction); *Reliable Automatic Sprinkler Co. v. Riverside Brass & Aluminum Foundry, Ltd.*, No. 20-CV-10220, 2022 WL 142375, at *5 (S.D.N.Y. Jan. 14, 2022) (same); *see also MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) ("The allegations [regarding personal jurisdiction] in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993))).

Finally, the Court assumes the truth of the factual allegations in the Second Amended Complaint and the motion papers filed by the parties as part of Defendants' motion to compel arbitration for the purpose of deciding Defendants' motion to compel arbitration. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (noting that when resolving a motion to compel arbitration, a "court consider[s] all relevant, admissible evidence submitted by the parties and contained in 'pleadings, depositions, answers to interrogatories, and admissions on file, together

Plaintiffs propose various nationwide and state-specific classes and subclasses, including Users, Minor Users, and Non-Users Classes. (*Id.* ¶ 253.) The proposed "Users Class" includes individuals who used the Temu platform; the "Minor Users Class" includes individuals who used the Temu platform while under the age of eighteen; and the "Non-Users Class" are individuals who "had electronic communications with Temu users or had their data stored on devices owned by Temu users, but are not Temu users themselves." (*Id.*)

PDD is a Cayman Islands corporation with its principal executive offices in Dublin, Ireland, operates the Pinduoduo e-commerce platform that offers products in various categories, and also owns the company that operates the Temu online marketplace. (*Id.* ¶¶ 32, 79.) Temu is a Delaware corporation with its principal place of business in Massachusetts, and operates the Temu App. (*Id.* ¶ 1–3, 33, 265.)

Plaintiffs allege that Defendants "do not function as separate and independent corporate entities," and that PDD "has directed the operations of [] Temu with respect to the Temu [A]pp, and [] Temu has reported to [] PDD." (*Id.* ¶¶ 34–35.) PDD employees "performed work on the Temu [A]pp," and Temu "acted as an agent, servant, partner, joint venturer, and/or alter ego" of PDD. (*Id.* ¶¶ 36, 38.) According to Plaintiffs, "Defendants constituted a single enterprise with a unity of interest." (*Id.* ¶ 39.)

**b. The Temu App's registration screen**

The Temu App has been available in the United States since September of 2022. (*Id.* ¶ 82.) The Temu App "provides a marketplace for Chinese suppliers to offer their products," and

---

with . . . affidavits'" (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 155 (2d Cir. 2002))); *McPherson v. Bloomingdale's, LLC*, No. 23-CV-1084 (E.D.N.Y. Dec. 8, 2023) ("Courts routinely consider documents outside the pleadings when evaluating motions to compel arbitration . . . ." (quoting *Sanchez v. Clipper Realty, Inc.*, 638 F. Supp. 3d 357, 366 (S.D.N.Y. 2022))).

"handles delivery, promotion and after-sales services for merchants on its platform." (*Id.* ¶ 83.) The Temu App is "based on the Pinduoduo [A]pp" and "many of the same software engineers who developed Pinduoduo also worked on what became known as the Temu [A]pp." (*Id.* ¶ 81.)

An individual must register for and create a Temu account to use the Temu App. (*See* Decl. of Michael Trinh in Supp. of Defs.' MTC ("Trinh Decl.") ¶¶ 4–5, Docket Entry No. 77.) As part of the registration process, users were shown the screen depicted below (the "Registration Screen"). (*Id.* ¶ 5.)




(Registration Screen, annexed to Trinh Decl. as Ex. A, Docket Entry No. 77-1.) The Registration Screen has a white background, displays a text box that prompts a user to enter their email or phone number, and features prominently a large, orange "Continue" button. (*Id.*) At the bottom of the screen, underneath various text boxes allowing a user to sign in with pre-existing accounts

on various platforms and social media networks, the following sentence is displayed: "By continuing, you agree to our **Terms of Use** and **Privacy & Cookie Policy**." (*Id.*) The phrases "**Terms of Use**" and "**Privacy & Cookie Policy**," appear bold and hyperlinked in a dark gray font, while the remainder of the sentence appears in a light gray font. (*Id.*)

**c. The terms of use**

The terms of use, hyperlinked on the Registration Screen, set forth policies and procedures governing the relationship between Temu App users and Temu (the "Terms").[4] (*See* Terms.) On the second page of the Terms, section 1.6 states in relevant part:

> PLEASE BE AWARE THAT SECTION 20 BELOW CONTAINS PROVISIONS GOVERNING HOW DISPUTES BETWEEN YOU AND TEMU WILL BE RESOLVED, INCLUDING WITHOUT LIMITATION, ANY DISPUTES THAT AROSE OR WERE ASSERTED PRIOR TO THE EFFECTIVE DATE OF THE TERMS. SECTION 20 CONTAINS, AMONG OTHER THINGS, AN AGREEMENT TO ARBITRATE WHICH REQUIRES, WITH LIMITED EXCEPTIONS, THAT ALL DISPUTES BETWEEN YOU AND TEMU BE RESOLVED BY BINDING AND FINAL ARBITRATION. UNLESS YOU OPT OUT OF THE AGREEMENT TO ARBITRATE WITHIN 30 DAYS OF THE EFFECTIVE DATE OF THE AGREEMENT: (1) YOU AND TEMU WILL ONLY BE PERMITTED TO PURSUE DISPUTES OR CLAIMS AND SEEK RELIEF AGAINST THE OTHER PARTY ON AN INDIVIDUAL BASIS, NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION OR PROCEEDING AND EACH OF US WAIVES OUR RIGHT TO PARTICIPATE IN A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION; AND (2) EACH OF US IS WAIVING OUR RIGHT TO PURSUE DISPUTES OR CLAIMS

[4] The parties provide different versions of the Terms. (*See* Temu's Terms of Use last updated July 8, 2023, annexed to Decl. of Jeannie Y. Evans ("Evans Decl.") as Ex. A, Docket Entry No. 78-2; Temu's Terms of Use last updated September 1, 2022, annexed to Evans Decl. as Ex. B, Docket Entry No. 78-3; Temu's Terms of Use last updated June 6, 2024, annexed to Trinh Decl. as Ex. B, Docket Entry No. 77-2.) The September 1, 2022 Terms differ significantly from both the July 8, 2023 Terms and the June 6, 2024 Terms. There are only minor differences between the July 8, 2023 version and the June 6, 2024 version that do not affect the Court's analysis, but the section numbering of the relevant sections regarding arbitration differ. The Court cites the July 8, 2023 Terms, which is the version of the Terms Plaintiffs cite in their briefing.

> AND SEEK RELIEF IN A COURT OF LAW AND TO HAVE A JURY TRIAL.

(*Id.* § 1.6; *see also id.* § 20.) Section 20.1 specifies that the parties:

> agree that any dispute, claim, or disagreement arising out of or relating in any way to your access to or use of [Temu's applications, products, services, and websites ("Services")], any communications you receive, any products sold or distributed through the Services, or the Terms, including claims and disputes that arose between us before the effective date of the Terms (each, a "Dispute") will be resolved by binding arbitration, using the English language, rather than in court, except [for claims brought and adjudicated in small claims court and claims involving intellectual property rights].

(*Id.* § 20.1.) However, before "either party commences arbitration against the other," the parties "will personally meet and confer telephonically or via videoconference, in a good faith effort to resolve informally any Dispute covered by this Arbitration Agreement ('Informal Dispute Resolution Conference')." (*Id.* § 20.2.) "The party initiating a Dispute must give notice to the other party in writing of its intent to initiate an Informal Dispute Resolution Conference ('Notice')[.]" (*Id.*) "Engaging in the Informal Dispute Resolution Conference is a condition precedent and requirement that must be fulfilled before commencing arbitration," and any "statute of limitations and any filing fee deadlines shall be tolled while the parties engage in the Informal Dispute Resolution Conference process required by this section." (*Id.*)

If the Informal Dispute Resolution Conference process "does not resolve satisfactorily within sixty (60) days after receipt of Notice, [the parties] agree that either party shall have the right to finally resolve the Dispute through binding arbitration." (*Id.* § 20.5.) "The arbitration will be conducted by [the] American Arbitration Association, (the 'AAA')," (*id.*), and the arbitrator "will be either a retired judge or an attorney licensed to practice law in the State of New York" and "will be selected by the parties from the AAA roster of consumer dispute arbitrators," (*id.* § 20.6). Section 20.7 of the Terms specifies that "[t]he arbitrator shall have

exclusive authority to resolve any Dispute, including, without limitation, disputes arising out of or related to the interpretation or application of the Arbitration Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement or any portion of the Arbitration Agreement," expect for limited exceptions, including disputes arising out of or relating to Section 20.4's class action waiver, disputes regarding the payment of arbitration fees, disputes about the satisfaction of any condition precedent to arbitration, and disputes about which version of the arbitration agreement applies. (*Id.* § 20.7.)

The Terms also contain a "batch arbitration" clause, which provides that:

> [I]n the event that there are one hundred (100) or more individual [r]equests of a substantially similar nature filed against Temu by or with the assistance of the same law firm, group of law firms, or organizations, . . . [the] AAA shall (1) administer the arbitration demands in batches of 100 [r]equests per batch (plus, to the extent there are less than 100 [r]equests left over after the batching described above, a final batch consisting of the remaining [r]equests); (2) appoint one arbitrator for each batch; and (3) provide for the resolution of each batch as a single consolidated arbitration with one set of filing and administrative fees due per side per batch, one procedural calendar, one hearing (if any) in a place to be determined by the arbitrator, and one final award ("Batch Arbitration").[5]

(*Id.* § 20.9.) If the batch arbitration clause is found to be invalid or unenforceable under the law to any extent, pursuant to Section 20.11, the entire Arbitration Agreement would have no "force and effect." (*See id.* § 20.11 ("Except as provided in Section 20.9, if any part or parts of this Arbitration Agreement are found under the law to be invalid or unenforceable, then such specific

[5] The Court notes that the more recent version of the Terms triggers the batch arbitration provision when 25 rather than 100 "substantially similar" Arbitration Notices are filed against Temu. The June 4, 2024 version of the Terms states that, "in the event that there are twenty-five (25) or more individual Arbitration Notices of a substantially similar nature filed against us by or with the assistance of the same law firm, group of law firms, or organizations . . ." (Temu's Terms of Use last updated June 1, 2024 24.) As noted above, the Court evaluates the earlier version of the Terms provided by Plaintiffs.

part or parts shall be of no force and effect and shall be severed and the remainder of the Arbitration Agreement shall continue in full force and effect.").)

**d. Data collection on the Temu App**

Plaintiffs allege that "Temu has been identified as one of the Chinese-affiliated apps that pose a significant threat to user data privacy." (SAC ¶ 88.) They allege that the Temu App's precursor, the Pinduoduo App, was "pulled from Google's Play Store due to the presence of malware on the app that exploited vulnerabilities in Android operating systems," (*id.* ¶ 90), and that "[c]ybersecurity researchers found that [the] Pinduoduo [App] could bypass users' cell phone security to monitor activities on other apps, check modifications, read private messages and change settings," (*id.* ¶ 92). Plaintiffs contend that the Temu App has many of the same issues as the Pinduoduo App, (*id.* ¶ 94), and further allege that various entities have investigated Temu for its alleged privacy violations, including the state governments of Arkansas and Montana, and the Committee on Energy and Commerce of the U.S. House of Representatives, (*id.* ¶¶ 94–99).

Plaintiffs also allege that "Defendants' representations regarding the products sold on the Temu platform are false and serve only to further conceal [Temu's] scheme to maximize the number of users who sign up to the platform and unwittingly subject their private data to theft by Defendants." (*Id.* ¶ 205; *see also id.* ¶¶ 202–23.) Investigative journalists reported that "the scope of the data collected by Temu is sweeping and goes well beyond the scope of the data that is needed to run an online shopping app." (*Id.* ¶ 100.) The reports included findings that the Temu App "ha[d] hidden functions that allow for extensive data exfiltration unbeknown to users" and that the Temu App "contains malware, spyware, and other means to 'plunder' user data." (*Id.* ¶¶ 102–03.) They also reported that, as soon as a user downloads the Temu App, "Temu can access users' cameras and microphones whenever the app is running" and "has the

ability to read and transmit files on the user's system 'with little or no encryption.'" (*Id.* ¶¶ 109–11.) The report also concludes that the available source code for the Temu App permits the "app to subsequently install any further program . . . that Defendants direct without the user's knowledge or control" and that the code creates "an open door" for "an unbounded use of exploitative methods." (*Id.* ¶¶ 113–15.) The code is "purposefully designed to hide . . . malicious features" and "Defendants have taken actions to prevent users from discovering the app's numerous data privacy violations." (*Id.* ¶¶ 137–49.)

Plaintiffs allege that because the Temu App gains access to "literally everything on your phone," "Defendants' collection of data from Temu users' devices includes data from non-users who engage in electronic communications with Temu users, such as through email or text messages," or from non-users who "stored information on a Temu user's device." (*Id.* ¶¶ 132–33.)

Plaintiffs also allege that Defendants improperly and unlawfully collect data from minors. (*Id.* ¶¶ 224–41.) In support, Plaintiffs allege that Defendants failed "to ensure that minor users, including minor users under the age of thirteen, had parental consent before they used the Temu platform," (*id.* ¶ 224), and also failed to "implement adequate age verification procedures" or ensure that minor users had "adequate opt-out rights or rights to delete collected information" after using the Temu App, (*id.*). Defendants collected minor users' personal information, "including persistent identifiers such as IP address and IMEI number[s]," without obtaining "verifiable parental consent." (*Id.* ¶ 239.)

Plaintiffs contend that "Defendants have engaged in such unscrupulous practices to maximize the collection of data from Temu users and non-users and increase their profits." (*Id.* ¶¶ 150–154.) Defendants "economically profit from the use of the data they have illicitly collected" while Plaintiffs "have incurred, and continue to incur, harm as a result of the invasion

of privacy stemming from Defendants' possession of their private and personally identifiable data and content." (*Id.* ¶¶ 150, 189.) In addition, "sources have indicated that Defendants have also profited from the data they collected by selling it to third parties." (*Id.* ¶ 150.) "[U]nder applicable [Chinese] law, user data owned by Chinese companies is available on command to officials of the Chinese communist government." (*Id.* ¶ 156.) Because Defendants "failed to implement adequate measures to prevent involuntary disclosure to third parties," (*id.* ¶¶ 167, 184), Plaintiffs' "private and personally identifiable data" is "now in the hands of unauthorized third parties," (*id.* ¶ 173).

**e. Procedural background**

After commencing this action in the United States District Court for the Northern District of Illinois, (Compl.), Plaintiffs moved to transfer this case to this Court because the Court already presided over similar litigation, *Hu v. Whaleco, Inc.*, No. 23-CV-6962 (E.D.N.Y.) (the "*Hu* litigation"), (Pls.' Mot. to Transfer, Docket Entry No. 29; Pls.' Mem. in Supp. of Pls.' Mot. to Transfer, Docket Entry No. 30.) On May 8, 2024, Judge Thomas M. Durkin granted Plaintiffs' motion to transfer venue and transferred this case to the Court, "where the related *Hu* litigation is pending." (Order dated May 8, 2024.)

On May 22, 2024, Plaintiffs moved to intervene in *Hu v. Whaleco, Inc.*, (Pls.' Notice of Mot. to Intervene, *Hu v. Whaleco, Inc.*, No. 23-CV-6962 (E.D.N.Y. May 22, 2024)), a class action complaint alleging Temu violated the Computer Fraud and Abuse Act, the Electronic Communications Privacy Act of 1986, various state laws, and committed various common law torts. (Am. Compl., *Hu v. Whaleco, Inc.*, No. 23-CV-6962 (E.D.N.Y. Feb. 19, 2024).) Temu moved to compel arbitration of the *Hu* Plaintiffs' claims. (*Hu* Defs.' Mot. to Compel Arbitration, *Hu v. Whaleco, Inc.*, No. 23-CV-6962 (E.D.N.Y. June 21, 2024).) The Court denied Plaintiffs' motion to intervene but granted their motion to participate as Amici. (Order, *Hu v.*

*Whaleco, Inc.*, No. 23-CV-6962 (E.D.N.Y. May 29, 2024).) Plaintiffs' amicus brief argued that (1) Temu failed to provide users with adequate notice of their terms of use; (2) the plain language of the arbitration clause made it unenforceable; (3) there was no contract formation because the parties lacked mutual consent; and (4) the batch arbitration clause was unconscionable. (Amicus Br., *Hu v. Whaleco, Inc.*, No. 23-CV-6962 (E.D.N.Y. July 5, 2024).) On October 1, 2024, the Court granted the *Hu* Defendants' motion to compel arbitration, explaining that Temu's "Registration Screen provided [p]laintiffs with 'reasonably conspicuous notice' of the Terms [of Service]," *Hu v. Whaleco, Inc.*, No. 23-CV-6962, 2024 WL 4481439, at *15 (E.D.N.Y. Oct. 1, 2024), and that plaintiffs, "through their conduct, unambiguously manifested assent to the Terms [of Service]," and therefore, plaintiffs and defendant "entered into an agreement to arbitrate," *id.* at *18. The Court also concluded that Temu's Terms of Service "provide[d] 'clear and unmistakable evidence' that the parties agreed to arbitrate disputes regarding questions of arbitrability," and because "neither [p]laintiffs nor [a]mici challenge[d] the delegation clause specifically, the Court must treat the delegation clause as valid and defer any questions of arbitrability to the arbitrator." *Id.* at *20.

## II. Discussion

### a. Standards of review

#### i. Motion to dismiss for lack of standing

"The Constitution limits federal courts to deciding 'Cases' and 'Controversies.'" *FEC v. Ted Cruz for Senate*, 596 U.S. 289, 295 (2022) (quoting U.S. Const. art. III, § 2). "'Standing to sue is a doctrine' that 'limits the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong.'" *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 183–84 (2d Cir. 2020) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)); *see also Packer ex rel. 1-800-Flowers.Com, Inc. v. Raging Cap. Mgmt., LLC*, 105 F.4th 46, 51 (2d Cir.

2024) ("Article III of the Constitution requires that plaintiffs establish standing to sue in federal court."). "To establish Article III standing, 'a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief.'" *Saba Cap. Cef Opportunities 1, Ltd. Nuveen Floating Rate Income Fund*, 88 F.4th 103, 110 (2d Cir. 2023) (quoting *Thole v. U.S. Bank N.A.*, 590 U.S. 538, 540 (2020)); *Liu v. Democratic Nat'l Comm.*, No. 21-3021, 2022 WL 4372587, at *1 (2d Cir. Sept. 22, 2022) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021)) (same); *see also Packer*, 105 F.4th at 51 (same). "An injury in fact must be 'particularized,' and it must be 'concrete.'" *Harty v. W. Point Realty, Inc.*, 28 F.4th 435, 442 (2d Cir. 2022) (quoting *Spokeo, Inc.*, 578 U.S. at 340).

"[S]tanding is required for subject matter jurisdiction." *James v. Willis*, No. 21-501, 2022 WL 481812, at *1 (2d Cir. Feb. 17, 2022) (citing *Strubel v. Comenity Bank*, 842 F.3d 181, 187 (2d Cir. 2016)). "If plaintiffs lack Article III standing, a court has no subject matter jurisdiction to hear their claim." *Bohnak v. Marsh & McLennan Cos.*, 79 F.4th 276, 282–83 (2d Cir. 2023) (quoting *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005)); *see Otrompke v. First Dep't Comm. on Character & Fitness*, No. 20-4107, 2021 WL 5764221, at *1 (2d Cir. Dec. 6, 2021) ("A district court lacks jurisdiction 'when . . . the plaintiff lacks constitutional standing to bring the action.'" (quoting *Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015))); *see also Citizens United to Protect Our Neighborhoods v. Vill. of Chestnut Ridge*, 98 F.4th 386, 391 (2d Cir. 2024) ("A district court properly dismisses an action for lack of subject-matter jurisdiction under Rule 12(b)(1) 'if the court lacks the statutory or constitutional power to adjudicate it, such as when the plaintiff[s] lack[] constitutional standing to bring the

action.'" (alterations in original) (quoting *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021))). "Before deciding any case on the merits, a district court must determine that it has subject matter jurisdiction over the matter. Therefore, for a case to proceed, the party invoking federal jurisdiction must plausibly plead that it has standing to sue." *Humphrey v. Syracuse Police Dep't*, 758 F. App'x 205, 205–06 (2d. Cir. 2019) (first citing *United States v. Bond*, 762 F.3d 255, 263 (2d Cir. 2014); and then citing *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 55 (2d Cir. 2016)); *Wachovia Bank v. Schmidt*, 546 U.S. 303, 316 (2006) ("[S]ubject-matter jurisdiction must be considered by the court on its own motion, even if no party raises an objection."); *Pan v. Whitaker*, 351 F. Supp. 3d 246, 249–50 (E.D.N.Y. 2019) ("[F]ederal courts have a continuing and independent duty to ensure that they possess subject matter jurisdiction, and must dismiss a case when they find subject matter jurisdiction lacking.").

**ii. Motion to dismiss for lack of personal jurisdiction**

On a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, "[a] plaintiff bears the burden of demonstrating personal jurisdiction over a person or entity against whom it seeks to bring suit." *Troma Ent., Inc. v. Centennial Pictures Inc.*, 729 F.3d 215, 217 (2d Cir. 2013) (quoting *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 34 (2d Cir. 2010)). The showing a plaintiff must make to meet that burden is governed by a "sliding scale," which "varies depending on the procedural posture of the litigation." *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken–Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). If a defendant challenges personal jurisdiction by filing a Rule 12(b)(2) motion, "the plaintiff need only make a prima facie showing that the court possesses personal jurisdiction over the defendant." *V&C Collection, LLC v. Guzzini Props. Ltd.*, 46 F.4th 127, 131 (2d Cir. 2022) (quoting *DiSteffano v. Carozzi n. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001)); *see also Holmes v.*

*Apple Inc.*, 797 F. App'x 557, 559 (2d Cir. 2019) ("A plaintiff has the burden of establishing personal jurisdiction over an entity against which it seeks to bring suit, and to survive a motion to dismiss for lack of such jurisdiction, 'a plaintiff must make a prima facie showing that jurisdiction exists.'" (quoting *Penguin Grp.*, 609 F.3d at 34–35)); *Eades v. Kennedy, PC L. Offs.*, 799 F.3d 161, 167–68 (2d Cir. 2015) ("In order to survive a motion to dismiss for lack of personal jurisdiction, a plaintiff must make a prima facie showing that jurisdiction exists." (quoting *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL (Licci IV)*, 732 F.3d 161, 167 (2d Cir. 2013))). Prior to discovery, a plaintiff need only plead "an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Holmes*, 797 F. App'x at 559–60 (quoting *Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010)); *see also Dix v. Peters*, 802 F. App'x 25, 27 (2d Cir. 2020) ("Where the district court grants a Rule 12(b)(2) motion without an evidentiary hearing, we credit the plaintiff's averment of jurisdictional facts as true." (citing *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996))); *Chirag v. MT Marida Marguerite Schiffahrts*, 604 F. App'x 16, 19 (2d Cir. 2015) ("A prima facie case requires non-conclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." (citing *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 185 (2d Cir. 1998))). After discovery, the plaintiff's "*prima facie* showing must be factually supported." *Dorchester Fin. Sec., Inc.*, 722 F.3d at 85 (quoting *Ball*, 902 F.2d at 197). "Conclusory allegations based only on information and belief are not sufficient" to provide such factual support. *McGlone v. Thermotex, Inc.*, 740 F. Supp. 2d 381, 383 (E.D.N.Y. 2010) (citing *Jazini*, 148 F.3d at 184).

In resolving a motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2), a district court may consider materials outside the pleadings. *Dorchester Fin. Sec., Inc.*, 722 F.3d at 86 (citing *S. New Eng. Tel. Co. v. Glob. NAPs Inc.*, 624 F.3d 123, 138 (2d Cir.

2010)); *see also Johnson v. UBS AG*, 791 F. App'x 240, 241 (2d Cir. 2019) ("Courts may consider materials outside the pleadings on a motion to dismiss for lack of personal jurisdiction without converting it into a summary judgment motion."); *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 676–77 (2d Cir. 2013) (noting that jurisdictional discovery had taken place and requiring evidentiary support for jurisdictional allegations). In addition, the court must "construe the pleadings and any supporting materials in the light most favorable to the plaintiffs." *Licci IV*, 732 F.3d at 167 (citing *Chloé*, 616 F.3d at 163); *see also Lelchook v. Société Générale de Banque au Liban SAL*, 67 F.4th 69, 72 n.1 (2d Cir. 2023) (same); *JCorps Int'l*, 828 F. App'x at 742 (quoting *DiStefano*, 286 F.3d at 84). However, the court need not "accept as true a legal conclusion couched as a factual allegation." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d at 673 (quoting *Jazini*, 148 F.3d at 185); *see also Lelchook*, 67 F.4th at 72 n.1 (quoting *Jazini*, 148 F.3d at 185).

**iii. Motion to compel arbitration**

The Federal Arbitration Act (the "FAA") requires courts to compel arbitration of claims that the parties have agreed to arbitrate. *See AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "Arbitration is a matter of contract and consent," and the Supreme Court has "long held that disputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024); *Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 114 (2d Cir. 2025) ("The [FAA] reflects 'both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract.'" (quoting *AT&T Mobility, LLC*, 563 U.S. at 339)). Thus, "[a]rbitration is 'a way to resolve those disputes — but only those disputes — that the parties have agreed to submit to arbitration.' Consequently, the first question in any arbitration dispute must be: What have these parties agreed to?" *Coinbase*, 602 U.S. at 148 (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)); *see*

*also Cooper v. Ruane Cunniff & Goldfarb Inc.*, 990 F.3d 173, 179 (2d Cir. 2021) ("Courts consider two factors when deciding if a dispute is arbitrable: '(1) whether the parties agreed to arbitrate, and, if so, (2) whether the scope of that agreement encompasses the claims at issue.'" (quoting *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 394 (2d Cir. 2015))); *Doctor's Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 250 (2d Cir. 2019) ("The threshold question facing any court considering a motion to compel arbitration is . . . whether the parties have indeed agreed to arbitrate." (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012))).

In deciding a motion to compel arbitration, courts apply a similar standard to that applied to a motion for summary judgment and "draw all reasonable inferences in favor of the non-moving party." *Davitashvili*, 131 F.4th at 115 (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 229 (2d Cir. 2016)); *see also Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 833–34 (2d Cir. 2021) (first quoting *Nicosia*, 834 F.3d at 229; and then quoting *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017)). "The party seeking to compel arbitration bears an initial burden of demonstrating that an agreement to arbitrate was made." *Zachman v. Hudson Valley Fed. Credit Union*, 49 F.4th 95, 101–02 (2d Cir. 2022). "This burden does not require the moving party to show that the agreement would be enforceable — only that an agreement to arbitrate existed." *Id.* at 102. If the existence of an agreement to arbitrate is established, the burden shifts to the party "seeking to avoid arbitration . . . [to show] the agreement to be inapplicable or invalid." *Harrington v. Atl. Sounding Co.*, 602 F.3d 113, 124 (2d Cir. 2010) (citing *Green Tree Fin. Corp.-Ala. v. Randolph*, 531 U.S. 79, 91–92 (2000)); *see also Zachman*, 49 F.4th at 102 (quoting *Harrington*, 602 F.3d at 124). In addition, "[a] district court must stay proceedings once it is 'satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" *Nicosia*, 834 F.3d at 229 (quoting *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 74 (2d Cir. 1997)); *see also Smith v. Spizzirri*, 601 U.S. 472,

478 (2024) ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, . . . the FAA compels the court to stay the proceeding."); *Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) ("[A] stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested.").

**b. The Non-Users fail to establish standing to pursue their claims**

Defendants argue that the Non-Users have not alleged a particularized, concrete injury because they cannot identify any data that Temu collected about them. (Defs.' MTD Mem. 9.) First, they argue that Plaintiffs' argument relies on mere speculation that Temu collected Non-Users' data. Defendants argue (i) Plaintiffs' allegations that the Non-Users' data was "subject to" collection is not "sufficient to show their data was *actually* collected by Temu," (*id.* at 9–10); (ii) Plaintiffs' "generic allegations that Temu collects 'electronic communications with Temu users'" do not "plausibly allege that Temu *actually* collects email or text messages" from Non-Users, (*id.* at 10; Defs.' MTD Reply 3–5); (iii) the "Non-Users' claims . . . . likewise depend on multiple layers of unsubstantiated conjecture," which are insufficient for standing under *Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013), (Defs.' MTD Mem. 11–12); (iv) Plaintiffs' claims that Temu collected their data because they "received spam texts and emails" from Temu, were "shown Temu ads," and "had fraudulent charges on their debit or credit cards" are "things that obviously can happen to anyone" and fail to "allege any specific facts about these events that would somehow suggest that they were caused by Temu collecting their data from a Temu user's device," (*id.* at 12); and (v) Plaintiffs do not identify any injury to any particular Non-User Plaintiff, as required by *Spokeo, Inc. v. Robbins*, (Defs.' MTD Reply 2–3). Second, they contend that even if Non-Users did allege that Temu accessed or collected their data, they fail to allege harm resulting from Defendants' purported access to their data. (Defs.' MTD Reply 5–6.)

Plaintiffs argue that they have sufficiently alleged injury to confer standing on the Non-

Users. They argue that Supreme Court and Second Circuit case law "do not require Plaintiffs to demonstrate that their data was actually collected or that Defendants used or profited from the data — all that is required is unauthorized access," and that Plaintiffs "in fact allege that Defendants collected and used their data." (Pls.' MTD Opp'n 2–4, 10–11.) Plaintiffs contend that the SAC "contains extensive factual allegations" to support their claims that Temu "accessed, collected, and profited from their private data without authorization," that the Non-Users had a reasonable expectation of privacy, and that they explain in the SAC "in detail how Temu collected data from [N]on-[U]sers [by] citing assessments by multiple experts." (*Id.* at 5, 13.) They also argue that Defendants incorrectly suggest that Non-Users' data is only collected when Temu users grant "permission" to the Temu App, but that they allege Temu "collects data automatically, 'bypassing' any features designed to prevent it." (*Id.* at 12–13.) In addition, Plaintiffs argue that although they do not need to allege that Defendants used any of the data they allegedly had access to, they do allege "Defendants used the data to generate profit, target ads, and sell to third parties," and also allege "diminution in value of the data, lost opportunity to market the data, and exposure of the data to the Chinese government." (*Id.* at 13.)

The Non-Users have failed to adequately plead a concrete injury-in-fact. Plaintiffs allege Non-Users were "subjected to data collection by Defendants using the Temu [A]pp" because, according to "experts" in reported news articles, Temu "bypasses" phone security systems to "read a user's private messages," including "messages with individuals who are not Temu users." (SAC ¶¶ 133, 135–36.) They allege that Non-Users shared sensitive data with Temu users "that were subject to collection by the Temu [A]pp," "such as social security numbers, credit card and debit card information, private photographs and videos, insurance information, images of birth certificates, passports, drivers licenses, and other photo identification." (*Id.* ¶ 251.) They also allege that they suffered "diminution of the value of their private and personally

identifiable data" because "to the extent it is available from other sources as a result of Defendants' unauthorized collection, the value of that data in the marketplace is diminished." (*Id.* ¶ 191.)

These assertions are insufficient to allege that any Non-User was actually or personally injured by Temu's data collection. Plaintiffs' allegations amount to only generic, conclusory assertions that Defendants "knowingly collected, came into possession of and maintained Plaintiffs' and Class Members' private and personally identifiable information," (*id.* ¶ 343), that "Defendants acted in a manner constituting theft by surreptitiously taking Plaintiffs' . . . private data through the Temu platform under false pretenses," (*id.* ¶ 480), and that Defendants "economically profit from" the use and sale of the data they improperly collected from Non-Users, (*id.* ¶ 150). Such generalized allegations are insufficient to meet the requirement that Plaintiffs plead injury that is "actual or imminent, not conjectural or hypothetical" and "affect[s] the plaintiff 'in a personal and individual way.'" *Weisberg v. Bessent*, No. 24-2124, 2025 WL 654996, at *1 (2d Cir. Feb. 28, 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 & n.1). In addition, their allegations that Non-Users were deprived of the opportunity to use and profit from their data "to the extent [that Non-Users' data] is available from other sources as a result of Defendants' unauthorized collection" is entirely speculative and abstract. Non-Users allege that "there are active markets for such data" and that Non-Users "could sell their data on those markets" but do not allege that any Non-User Plaintiff's data was *actually* collected, sold to a third party, and thereby diminished in value compared to the profit the Non-User Plaintiff had planned to generate from their data. *See, e.g.*, *Spira v. TransUnion, LLC*, No. 21-CV-2367, 2022 WL 2819469, at *1, *3 (S.D.N.Y. July 19, 2022) (explaining that plaintiff's allegations that he "suffered damage for the loss of credit, loss of the ability to purchase and benefit from credit, [and] a chilling effect on future applications for credit" failed to "demonstrate that he suffered

any concrete harm"); *Grauman v. Equifax Info. Servs., LLC*, 549 F. Supp. 3d 285, 292 (E.D.N.Y. 2021) (explaining that plaintiff did not allege concrete harm where he made no allegation that he was trying to or imminently planned to use his credit score to procure credit). Even if Plaintiffs are correct that they need not plead that Defendants "actually collected" or "used or profited from the[ir] data," but only must allege Defendants had "unauthorized access" to their data,[6] (Pls.' MTD Opp'n 4), Plaintiffs' claims nevertheless fail because they do not identify any particular data Defendants allegedly had access to from any of the Non-User named plaintiffs. *Miller v. James*, No. 24-2785, 2025 WL 1085815, at *2 (2d Cir. Apr. 9, 2025) (affirming dismissal of plaintiffs' claims where plaintiffs "alleged no facts to support their conclusory assertion of . . . harm" because "plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing" (quoting *Baur v.*

[6] Plaintiffs rely on *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021); *Salazar v. NBA*, 118 F.4th 533 (2d Cir. 2024); and *Bohnak v. Marsh & Mclennon Cos.*, 79 F.4th 276 (2d Cir. 2023) to support their argument that "a defendant's access to, or review of, consumers' private data violates their right to privacy," without requiring allegations that defendants collected, used, or profited from a plaintiff's data. (Pls.' MTD Opp'n 2–4.) The Court is not persuaded that any of those cases support the argument that mere unauthorized access to data, without more, demonstrates sufficient injury for standing purposes. In *TransUnion*, the Supreme Court concluded that the plaintiffs whose credit reports "were disseminated to third parties" alleged a sufficiently concrete injury-in-fact to support standing, but concluded that plaintiffs who did not allege that their files "were ever provided to third parties or caused a denial of credit" did not allege a concrete harm. *TransUnion*, 594 U.S. at 433, 438. In both *Salazar* and *Bohnak*, the individual plaintiffs alleged that specific individuals or entities actually exposed their data to third parties. *See Salazar*, 118 F.4th at 538 (explaining the plaintiff alleged that the National Basketball Association actually shared his personal viewing information with Meta without authorization); *Bohnak*, 79 F.4th at 281, 283 (explaining that the plaintiff's name, Social Security or tax ID number, and other personally identifiable information were actually exposed to an unauthorized third party). Thus, in all three cases, the plaintiffs adequately pled a concrete injury because the defendants both collected their data and also exposed it to third parties. In this case, Plaintiffs argue that Defendants' access to data is alone sufficient to qualify as a violation of privacy, but the plaintiffs in *TransUnion*, *Bohnak*, and *Salazar* alleged that their data was actually collected and used by a third party. *TransUnion*, *Salazar*, and *Bohnak* do not support Plaintiffs' argument that they are only required to show that an entity had "unauthorized access" to data but are not required "to demonstrate that their data was actually collected or that [d]efendants used or profited from the data." (Pls.' MTD Opp'n 4.)

*Veneman*, 352 F.3d 625, 636–37 (2d Cir. 2003))); *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 76 (2d Cir. 2022) ("Plaintiffs' threadbare assertions are conclusory and do not raise a reasonable inference of injury."); *Berger v. L.L. Bean, Inc.*, 351 F. Supp. 3d 256, 264 (E.D.N.Y. 2018) ("[E]ven named plaintiffs who represent a class 'must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong.'" (quoting *Spokeo*, 578 U.S. 338 n.6)); *Ross v. AXA Equitable Life Ins. Co.*, 115 F. Supp. 3d 424, 432 (S.D.N.Y. 2015) ("Significantly, '[t]hat a suit may be a class action'— as this one is —'adds nothing to the question of standing, for even named plaintiffs who represent a class must allege and show that they personally have been injured.'" (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996))). Plaintiffs' briefing extensively recites the allegations in the SAC, including that the Temu app can read, modify, and write all files on a user's device, that Google and Apple reported issues with the Pinduoduo App and Temu App, and that various governments have investigated Temu for alleged privacy violations, none of which advance Plaintiffs' arguments as to the Non-Users' alleged injuries. (Pls.' MTD Opp'n 6–10.) It is not apparent from the allegations in the SAC what specific, concrete injuries *any* of the Non-Users have suffered. Because Non-User Plaintiffs have the burden to allege each element of standing and fail to allege the "first and foremost of standing's three elements," an injury-in-fact, Non-Users fail to establish standing. *Spokeo*, 578 U.S. at 338–39 (brackets omitted). Accordingly, Plaintiffs lack standing to bring Non-Users' claims and the Court therefore grants Defendants' motion to dismiss. The Court dismisses the Non-Users' claims against Temu and PDD for lack of standing without prejudice. *See Johns v. Do*, No. 23-CV-3497, 2024 WL 4171023, at *4 (E.D.N.Y. Sept. 12, 2024) (dismissing purported class action for lack of standing where plaintiffs do "not actually allege" that plaintiffs were fined and therefore failed to establish injury-in-fact); *Tarsio v. FCA US LLC*, No. 22-CV-9993, 2024 WL 1514211, at *5 (S.D.N.Y.

Apr. 8, 2024) (finding plaintiff lacked standing where his allegations of harm "are conclusory and unsupported by any facts" and "only makes vague references" to injuries and dismissing the plaintiff's claim without prejudice); *see also DuBose v. SUNY Mar. Coll. Off. of Fin. Aid*, No. 24-CV-5547, 2025 WL 1488983, at *3 (S.D.N.Y. May 23, 2025) (explaining that "a dismissal for lack of standing under Rule 12(b)(1) is without prejudice" (citing *Katz v. Donna Karan Co.*, 872. F.3d 114, 121 (2d Cir. 2017))); *Martin v. Bottom Line Concepts, LLC*, 723 F. Supp. 3d 280 (S.D.N.Y. 2024) ("[A] dismissal for lack of standing is, 'by definition, without prejudice.'" (quoting *Harty*, 28 F.4th at 445)).[7]

**c. The Court lacks personal jurisdiction over the Users' and Minors' claims against PDD**

Defendants argue that the Court should dismiss the Users' and Minors'[8] claims against PDD because PDD "has no business contacts with New York and is therefore not subject to

---

[7] Defendants also argue that the Non-Users fail to state a claim and their claims should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Defs.' MTD Mem. 13–24; Defs.' MTD Reply 6–15.) Because standing is "a limitation on the authority of a federal court to exercise jurisdiction," *Lugo*, 114 F.4th at 86 n.1 (quoting *All. for Env't Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006)), the Court does not reach Defendants' Rule 12(b)(6) argument as to the Non-Users because the Court concludes that Plaintiffs' claims on behalf of the Non-Users fail for lack of standing. *See, e.g.*, *Port Auth. Police Lieutenants Benevolent Ass'n Inc. v. City of New York*, 718 F. Supp. 3d 300, 309–10 (S.D.N.Y. 2024) ("[B]ecause the Court has held that [plaintiff] lacks standing to pursue her claims, so as to require dismissal under Rule 12(b)(1) for lack of subject matter jurisdiction, the [c]ourt has no occasion to reach [defendant's] arguments under Rule 12(b)(6)." (first and second alterations in original) (quoting *Kelen v. Nordstrom, Inc.*, 259 F. Supp. 3d 75, 82 (S.D.N.Y. 2016))); *Bellocchio v. Garland*, 614 F. Supp. 3d 11, 19 (S.D.N.Y. 2022) (explaining that the court "lacks the legal basis to consider the merits of [p]laintiff's claims" under Rule 12(b)(6) because plaintiffs have failed to establish standing and the court "lacks subject matter jurisdiction").

[8] Defendants argue that all claims against PDD should be dismissed for lack of personal jurisdiction. (Defs.' MTD Mem. 24–29.) The Court concludes in section II.b. *supra* that the Non-Users lack standing to bring claims against Temu and PDD. Accordingly, the Court does not decide whether the Non-Users' claims against PDD should be dismissed for lack of personal jurisdiction. *See, e.g.*, *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 151 n.5 (E.D.N.Y. 2017)

personal jurisdiction" in New York. (Defs.' MTD Mem. 24.) First, they argue that PDD is not subject to specific jurisdiction in New York because it "is a holding company with no independent business operations." (*Id.*; Defs.' MTD Reply 15–19.) In support, they argue that Plaintiffs have not "identif[ied] a single action directed by PDD . . . toward New York," (Defs.' MTD Reply 18), including any business operations or tortious conduct as required under New York's long-arm statute, New York Civil Practice Law and Rules ("C.P.L.R.") § 302(a). Defendants argue that PDD being listed on the NASDAQ, consenting to New York jurisdiction in a deposit agreement, and Temu's "campus ambassadors" program do not confer specific jurisdiction in New York in this case. (Defs.' MTD Mem. 28–29.) Second, Defendants contend that courts have "routinely rejected" Plaintiffs' argument that PDD "can be sued in New York simply because it is Temu's parent company." (*Id.* at 25–28; Defs.' MTD Reply 17.) Third, they argue that "[b]ecause PDD . . . is a Cayman Islands [c]orporation with its principal offices in Ireland," PDD is not subject to general jurisdiction in New York. (Defs.' MTD Mem. 24 n.15; Defs.' MTD Reply 16–17.)

Plaintiffs argue that PDD is subject to personal jurisdiction in New York for several reasons. First, they argue that PDD "transacted business with Temu users and non-users, collected data from them, and used this data in its operations" in New York and is subject to specific jurisdiction under C.P.L.R. § 302(a)(1). (Pls.' MTD Opp'n 30–33.) In support, they argue that PDD "marketed Temu in the United States, including New York," and "raised capital in New York" to fund its operations, including "listing stock on the [NASDAQ] exchange . . . and executing associated contracts that prescribed 'federal or state courts' in New York City as the forum for litigation of disputes." (*Id.* at 33.) They also argue that the Court "may

("Because the court has determined that the [plaintiffs] fail to establish standing, it need not address the question of personal jurisdiction as to their [c]omplaint.").

independently exercise jurisdiction over PDD . . . because it owns and operates a logistics network that fulfills orders placed on Temu." (*Id.* at 33–34.) Second, they argue that Temu is an agent of PDD, and that "the Court may exercise jurisdiction over PDD . . . due to the actions of its subsidiary" Temu. (*Id.* at 34–35.) Third, they argue that PDD is subject to general jurisdiction under C.P.L.R. § 301, "which provides jurisdiction over out-of-state corporations that are 'doing business' in New York." (*Id.* at 37.) In support, they argue that PDD is "doing business" in New York because its subsidiary Temu is "both an 'agent' and 'department'" of PDD. (*Id.* at 37–39.) They also argue that PDD is subject to jurisdiction under C.P.L.R. § 301 through its "own activities," including "ship[ping] hundreds of thousands or millions of products purchased on Temu" into New York, "fund[ing] Temu's operations by listing stock on [NASDAQ], "entering into agreements in New York," and "submit[ting] to personal jurisdiction in federal and state courts in New York." (*Id.* at 39–40.) Finally, Plaintiffs argue that PDD is subject to personal jurisdiction under Rule 4(k)(2) of the Federal Rules of Civil Procedure because PDD "has not identified another forum in the U.S. where it could be sued, and, personal jurisdiction does not offend due process[.]" (*Id.* at 40.)

"There are two types of personal jurisdiction: specific and general." *Sonera Holding B.V. v. Çukurova Holding A.Ş.*, 750 F.3d 221, 225 (2d Cir. 2014) (per curiam). Specific jurisdiction requires a connection between the forum exercising jurisdiction over the defendant and the underlying controversy that gave rise to the claim. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 331 (2d Cir. 2016) ("Specific jurisdiction . . . depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum state and is therefore subject to the State's regulation." (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011))). Under New York law, courts exercise specific jurisdiction pursuant to C.P.L.R. § 302 and general jurisdiction pursuant to

C.P.L.R. § 301. General jurisdiction permits a court to exercise personal jurisdiction over a defendant regardless of whether the underlying claim has a connection to the forum. *Sonera Holding*, 750 F.3d at ("A court with general jurisdiction over a corporation may adjudicate *all* claims against that corporation — even those entirely unrelated to the defendant's contacts with the state.").

**i. Specific jurisdiction**

Under C.P.L.R. § 302(a), there are four bases for extending specific personal jurisdiction over a non-domiciliary defendant.[9] *Penguin Grp.*, 609 F.3d at 35 n.3 (citing to section 302(a) to describe all four bases for jurisdiction under the New York long-arm statute); *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007) (same); *Creative Photographers, Inc. v. Grupo Televisa, S.A.B.*, 763 F. Supp. 3d 618, 630–31 (S.D.N.Y. 2025) (citing N.Y. C.P.L.R. § 302(a)) (same); *Bah v. Apple Inc.*, No. 19-CV-3539, 2020 WL 614932, at *4 (S.D.N.Y. Feb. 10, 2020) (same). Section 302(a)(1) permits courts "to exercise personal jurisdiction over [a] non-domiciliary" where the "cause of action aris[es] from any of the acts enumerated in the [statute]" and the defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1); *see also Kurzon LLP v. Thomas M. Cooley L. Sch.*, No. 12-CV-8352, 2014 WL 2862609, at *5 (S.D.N.Y. June 24, 2014) (defining

---

[9] C.P.L.R. § 302(a) provides that:

> a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: (1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . . ; or (3) commits a tortious act without the state causing injury to person or property within the state . . . ; or (4) owns, uses or possesses any real property within the state.

N.Y. C.P.L.R. § 302(a). Plaintiffs do not allege PDD "owns, uses or possesses any real property" within New York state to support a finding of personal jurisdiction under section 302(a)(4). The Court accordingly only addresses whether it has jurisdiction over PDD under sections 302(a)(1), 302(a)(2), or 302(a)(3).

circumstances under which a court may exercise specific personal jurisdiction over non-domiciliary defendant pursuant to section 302(a)(1)). In addition, even if a plaintiff can establish jurisdiction under New York law, the court must also determine whether the "exercise of personal jurisdiction over a foreign defendant comports with [the] due process protections established under the United States Constitution." *Licci IV*, 732 F.3d at 168 (first citing *Best Van Lines, Inc.*, 490 F.3d at 242; and then citing *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)); *see also Edwardo v. Roman Cath. Bishop of Providence*, 66 F.4th 69, 75 (2d Cir. 2023) ("To determine whether jurisdiction exists over a non-domiciliary, we first consider whether the state's long-arm statute provides a statutory basis for jurisdiction and, if so, whether exercising personal jurisdiction would comport with due process." (citing *Eades*, 799 F.3d at 167–68)).

"In order to evaluate whether personal jurisdiction exists pursuant to C.P.L.R. § 302(a)(1), [the court] must determine: (1) whether [the defendants] transacted any business in New York, and, if so, (2) whether there was an articulable nexus, or substantial relationship, between the [conduct] and the actions that occurred in New York." *Penachio v. Benedict*, 461 F. App'x 4, 5 (2d Cir. 2012) (citing *Best Van Lines, Inc.*, 490 F.3d at 246); *see also Yih v. Taiwan Semiconductor Mfg. Co.*, 815 F. App'x 571, 574 (2d Cir. 2020) (quoting N.Y. C.P.L.R. § 302(a)(1)); *Licci IV*, 732 F.3d at 168 (stating that section 302(a)(1) has two prongs: (1) the defendant "must have transacted business within the state," either itself or through an agent, and (2) the cause of action "must arise from that business activity" (quoting *Sole Resort, S.A. de C.V. v. Allure Resorts Mgmt., LLC*, 450 F.3d 100, 103 (2d Cir. 2006))); *Paige v. Digit. Bus. Networks All., Inc.*, No. 24-CV-3169, 2025 WL 753952, at *8 (S.D.N.Y. Mar. 10, 2025) ("To determine the existence of jurisdiction under Section 302(a)(1), a court must decide (1) whether the defendant transacts any business in New York and, if so, (2) whether this cause of action arises from such a business transaction." (quoting *Johnson v. Stop & Shop Supermarket Co., LLC*, No.

22-CV-9691, 2024 WL 1217074, at *7 (S.D.N.Y. Mar. 21, 2024))). Under New York state law, a defendant's lack of physical presence in the state is not dispositive of whether he transacts business within the state, "so long as the defendant's activities [within the state] were purposeful and there is a substantial relationship between the transaction and the claim asserted." *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quoting *Deustche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 7 N.Y.3d 65, 71 (2006)); *see also Edwardo*, 66 F.4th at 76 ("[A] chain of causation involving physical presence in New York does not, by itself, create a nexus between an otherwise unrelated tort claim and a business transaction. Rather, the claim asserted must arise from th[e] business activity, so that there is a direct relation between the cause of action and the in-state [business] conduct." (second and third alterations in original, citations and quotation marks omitted)); *Licci ex rel. Licci v. Lebanese Can. Bank, SAL (Licci II)*, 673 F.3d 50, 61 (2d Cir. 2012) ("A defendant need not physically enter New York State in order to transact business, 'so long as the defendant's activities [within the state] were purposeful.'" (quoting *Fischbarg*, 9 N.Y.3d at 380)); *C. Mahendra (N.Y.), LLC v. Nat'l Gold & Diamond Ctr., Inc.*, 3 N.Y.S.3d 27, 30 (App. Div. 2015) ("The statute applies where the defendant's New York activities were purposeful and substantially related to the claim." (citing *D & R Glob. Selections, S.L. v. Piñeiro*, 934 N.Y.S.2d 19, 20 (App. Div. 2011))). "Transacting business under § 302(a)(1) means 'purposeful activity — some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Am. Girl, LLC v. Zembrka*, 118 F.4th 271, 277 (2d Cir. 2024) (quoting *Spetner v. Palestine Inv. Bank*, 70 F.4th 632, 640 (2d Cir. 2023)), *cert. denied*, 145 S. Ct. 1130 (2025); *Eades*, 799 F.3d at 168 ("Purposeful activities are those with which a defendant, through volitional acts, avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." (quoting *Fischbarg*, 9 N.Y.3d at 380)).

In determining whether a defendant is purposefully transacting business in New York, a court must look at "the quality of the defendant['s] New York contacts." *Fischbarg*, 9 N.Y.3d at 380; *Best Van Lines, Inc.*, 490 F.3d at 246 ("Courts look to 'the totality of the defendant's activities within the forum' to determine whether a defendant has 'transact[ed] business' in such a way that it constitutes 'purposeful activity' satisfying the first part of the test." (alteration in original) (citations omitted) (first quoting *Sterling Nat'l Bank & Tr. Co. of N.Y. v. Fidelity Mortg. Invs.*, 510 F.2d 870, 873 (2d Cir. 1975); and then citing *Longines-Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 457 (1965))); *see also Licci II*, 673 F.3d at 62 (noting that a single act or "an ongoing course of conduct or relationship in the state may" suffice to establish jurisdiction). "[M]ore limited contacts regarding services to be performed outside New York would not satisfy [section] 302(a)(1)." *Yih*, 815 F. App'x at 574 (citing *Fischbarg*, 9 N.Y.3d at 380).

To satisfy the "arises from" prong, a plaintiff must show that there is a "substantial relationship" or "articulable nexus" between the claim asserted and the actions taken in New York. *Edwardo*, 66 F.4th at 76 (quoting *Sole Resort*, 450 F.3d at 103); *Best Van Lines, Inc.*, 490 F.3d at 246 (quoting *Henderson v. INS*, 157 F.3d 106, 123 (2d Cir.1998)); *see also Licci ex rel. Licci v. Lebanese Canadian Bank, SAL (Licci III)*, 20 N.Y.3d 327, 341 (2012) ("[W]here at least one element [of the cause of action pleaded] arises from the New York contacts, the relationship between the business transaction and the claim asserted supports specific jurisdiction under [section 302(a)(1)].").

**1. PDD is not subject to specific jurisdiction under Section 302(a)(1)**

Plaintiffs have not adequately alleged that PDD transacted business in New York. Plaintiffs' arguments about PDD's alleged New York business conduct include: (1) PDD's

acknowledgement in an annual report that it is "subject to complex and evolving laws and regulations regarding privacy and data protection in the countries and regions where we have operations" and that these "laws and regulations" may "result in claims" against PDD, (Pls.' MTD Opp'n 32–33 (quoting SAC ¶ 60)); (2) PDD's marketing and advertisements of Temu "in the United States, including New York," (*id.* at 33 (quoting SAC ¶ 67)); (3) PDD's listing on the NASDAQ exchange, (*id.* (citing SAC ¶ 32)); (4) PDD's execution of contracts related to its listing on the NASDAQ that "prescribed 'federal or state courts' in New York City as the forum for litigation of disputes," (*id.* (quoting SAC ¶ 75)); and (5) Temu's "leverage[]" of PDD's logistics and shipping network to ship items "to Temu users in the U.S. (and New York)," (*id.* at 34 (citing SAC ¶¶ 52–53, 55, 87)). None of these allegations suggest that PDD purposefully targets New York, but rather the United States market as a whole, which incidentally includes New York. General allegations about PDD's conduct towards the United States overall are insufficient to establish specific jurisdiction in New York. *See Creative Photographers, Inc*, 763 F. Supp. 3d at 632 (finding no personal jurisdiction because the complaint "does not clarify whether [the d]efendant transacted with a New York entity"); *Quarmby v. Rexon Indus. Corp. Ltd.*, No. 21-CV-671, 2022 WL 17812965, at *10 (W.D.N.Y. Nov. 28, 2022) (finding no personal jurisdiction where the "[p]laintiff has not mustered any direct evidence of [the defendant's] purposeful contact with New York" (first alteration in original) (quoting *Piotrowicz v. Techtronic Indus. N. Am., Inc.*, No. 19-CV-11522, 2022 WL 2870811, at *11 (S.D.N.Y. 2022))), *report and recommendation adopted*, 2022 WL 17812576 (W.D.N.Y. Dec. 19, 2022); *RLP Ventures LLC v. All Hands Instruction NFP*, No. 18-CV-3988, 2019 WL 1316030, at *6 (S.D.N.Y. Mar. 22, 2019) (finding no personal jurisdiction where defendant did not "target New York specifically"); *cf. Twin Beauty LLC v. NR Interactive LLC*, No. 24-CV-7412, 2024 WL 5108153, at *6–7 (E.D.N.Y. Dec. 14, 2024) (finding plaintiff "has not satisfied its burden to

show that" defendant transacted business in New York because plaintiff "has not identified a single, actual transaction between defendants and a customer in New York"). In addition, Plaintiffs' claims do not "aris[e] from" PDD's alleged business contacts with New York, including PDD's statements in its annual report that it is subject to evolving data privacy laws and PDD's listing on the NASDAQ and contracts related to that listing. PDD's alleged privacy violations are completely unrelated to any of these contacts. *See Real Selling Grp. LLC v. ESN Grp., Inc.*, No. 20-CV-1468, 2021 WL 535748, at *6 (S.D.N.Y. Feb. 12, 2021) (explaining that defendant's business contacts "are clearly insufficient for the exercise of personal jurisdiction, as [the plaintiff's] claims do not arise from" them); *cf. Twin Beauty LLC*, 2024 WL 5108153, at *4 (finding the plaintiff has not established jurisdiction under section 302(a)(1) where the "[p]laintiff's claims do not appear to arise out of defendants' . . . sales"). Plaintiffs' allegations are also refuted by Defendant's declaration of Kairui Zhang, Director of Investor Relations of PDD, that PDD "is not registered to do business in New York or the U.S." and "does not hold any licenses by any state in the U.S. or local government agency in New York." (Decl. of Kairui Zhang ("Zhang Decl.") ¶ 7, Docket Entry No. 73.) Zhang also attests in his affidavit that PDD "has never appointed any agent for service of process in New York," (*id.* ¶ 8), and does not and has never owned, leased, operated, or maintained an office in New York, (*id.* ¶¶ 9, 10).[10] The

[10] Plaintiffs argue that the Zhang declaration "ignores the factual record establishing jurisdiction" and makes "unsupported assertions that are contradicted by the record." (Pls.' Opp'n 35.) In particular, Plaintiffs contests Zhang's statements that PDD (1) does not operate any substantive business; (2) does not operate the Temu marketplace; (3) has never directed sales or marketing toward New York or the United States; (4) is not involved in managing Whaleco or Temu; and (5) does not share any employees with Whaleco and "has not taken various other actions in the United States." (Evans Decl.) Despite Zhang's declaration to the contrary, the Court accepts Plaintiffs' allegations as to these facts because Plaintiffs specifically contested them; however, the Court relies on the facts in Zhang's declaration that Plaintiffs did not contest. *See Krisko v. Marvel Ent., LLC*, 473 F. Supp. 3d 288, 297 (S.D.N.Y. 2020) ("If the parties present conflicting affidavits, however, 'all factual disputes are resolved in the plaintiff's favor,

Court accordingly finds that PDD is not subject to specific personal jurisdiction under C.P.L.R. § 302(a)(1). *See Minden Pictures, Inc. v. Grupo Televisa, S.A.B.*, 738 F. Supp. 3d 458, 465 (S.D.N.Y. 2024) (explaining that "plaintiff cannot rest on the allegations in its amended complaint . . . to establish personal jurisdiction" given the defendant's declaration that their website is "not available in the United States" and that the print version of the website "is not distributed in the United States") (quotation marks and citations omitted); *Reliable Automatic Sprinkler Co. v. Riverside Brass & Aluminum Foundry, Ltd.*, No. 20-CV-10220, 2022 WL 142375, at *5 (S.D.N.Y. Jan. 14, 2022) (concluding defendant was not subject to jurisdiction under section 302(a)(1) where their declaration stated that their contractual obligations were all fulfilled in Canada rather than New York); *see also MacDermid, Inc. v. Deiter*, 702 F.3d 725, 727 (2d Cir. 2012) ("The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits." (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 580 (2d Cir. 1993))).

**2. PDD is not subject to specific jurisdiction under Section 302(a)(2) or 302(a)(3)**

Although Plaintiffs cite three provisions of New York's long-arm statute, (Pls.' MTD Opp'n 30–33), they only make arguments as to PDD's conduct under 302(a)(1); namely, that PDD "transact[ed] . . . business within the state." N.Y. C.P.L.R. § 302(a)(1). Plaintiffs cite sections 302(a)(2) and 302(a)(3), but have alleged no facts and make no arguments to support that PDD either committed a "tortious act within the state" or caused harm within New York state resulting from PDD's alleged tortious conduct. N.Y. C.P.L.R. §§ 302(a)(2); 302(a)(3).

---

and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.'" (quoting *Seetransport Wiking Trader*, 989 F.2d at 580)).

Both sections 302(a)(2) and 302(a)(3) require a defendant's tortious conduct to have taken place in New York state. *See, e.g.*, *Edwardo*, 66 F.4th at 75 ("The acts giving rise to [plaintiff's] lawsuit . . . were performed by persons physically present in Missouri and not in New York. Even if [plaintiff] suffered injury in New York, that does not establish a tortious act in the state of New York within the meaning of § 302(a)(2)." (alterations in original) (quoting *Bensusan Rest. Corp. v. King*, 126 F.3d 25, 29 (2d Cir. 1997))); *Timothy Coffey Nursery Landscape Inc. v. Soave*, 760 F. App'x 58, 61 (2d Cir. 2019) ("Courts determining whether there is injury in New York sufficient to warrant jurisdiction under [section 302(a)(3)] generally apply a situs-of-injury test, where the 'situs of the injury is the location of the original event which caused the injury, not the location where the resultant damages are felt by the plaintiff.'" (quoting *Whitaker v. Am. Telecasting, Inc.*, 261 F.3d 196, 209 (2d Cir. 2001))); *Mann v. Camp Fatima, Inc.*, No. 22-CV-4740, 2023 WL 10354262, at *7 (E.D.N.Y. Nov. 8, 2023) ("To that end, courts [evaluating personal jurisdiction under section 302(a)(3)] look to 'the place where the underlying, original event occurred which caused the injury . . . not the location where the resultant damages are felt by the plaintiff.'" (emphasis omitted) (quoting *M & M Packaging, Inc. v. Kole*, 298 F. App'x 39, 42 (2d Cir. 2008))), *report and recommendation adopted*, 2024 WL 549282 (E.D.N.Y. Feb. 12, 2024); *Reinhardt v. City of Buffalo*, No. 21-CV-206, 2022 WL 2442300, at *7 (W.D.N.Y. July 5, 2022) ("[A] negligent act that takes place outside of New York . . . does not confer jurisdiction under § 302(a)(2).").

Plaintiffs have not alleged any facts to support their assertion that PDD committed a tort or tortious conduct within New York state. To the extent Plaintiffs argue that PDD is subject to jurisdiction under sections 302(a)(2) or 302(a)(3), the Court finds that Plaintiffs have failed to state a prima facie case for personal jurisdiction over PDD under either section. *See, e.g.*, *D'Anzieri v. Harrison Glob. LLC*, No. 21-CV-8506, 2025 WL 1755095, at *7 (E.D.N.Y. June

25, 2025) (concluding the court did not have personal jurisdiction over the defendant under section 302(a)(2) because he was "located outside of New York when he engaged in the conduct at issue"); *Twin Beauty LLC*, 2024 WL 5108153, at *6–7 (finding no personal jurisdiction under section 302(a)(3) where none of "defendants' alleged tortious" conduct "occurred in New York"); *Konopka v. Clemons*, No. 21-CV-7080, 2023 WL 5350826, at *4 (E.D.N.Y. Aug. 21, 2023) (explaining plaintiff did not establish personal jurisdiction under section 302(a)(3) where plaintiff "does not allege that any injury-causing event occurred within New York"); *Bayshore Cap. Advisors, LLC v. Creative Wealth Media Fin. Corp.*, 667 F. Supp. 3d 83, 143 (S.D.N.Y. 2023) (finding no personal jurisdiction where plaintiffs "have not alleged what business activity occurred" in New York "that is related to any cause of action in this case"); *see generally Am. Infertility of N.Y., P.C. v. CNY Fertility, PLLC*, No. 21-CV-5566, 2021 WL 4803539, at *1 (S.D.N.Y. Oct. 13, 2021) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed . . . ." (alteration in original) (quoting *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998))).

**3. PDD is not subject to specific jurisdiction under an agency theory**

Plaintiffs also do not sufficiently allege that PDD is subject to jurisdiction in New York under an agency theory.

"To establish agency under [New York's long-arm statute], the non-resident principal must request not just the alleged agent's general presence in New York but also the activities giving rise to suit." *Edwardo*, 66 F.4th at 74–75 (quoting *E. N.Y. Sav. Bank v. Republic Realty Mortg. Corp*, 402 N.Y.S.2d 639, 641 (App. Div. 1978)); *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 85 (2d Cir. 2018) ("Under [New York's long-arm] statute, there is jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New

York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.'" (quoting *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122 (2d Cir. 1981))); *Bloomfield v. Alvest (USA), Inc.*, No. 23-CV-5090, 2025 WL 888476, at *6 (E.D.N.Y. Mar. 21, 2025) ("[T]here is jurisdiction over a principal based on the acts of an agent where 'the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal.'" (quoting *Schwab*, 883 F.3d at 85)). However, "sparse allegations of agency" are insufficient "to make a prima facie showing of personal jurisdiction." *Schwab*, 883 F.3d at 86; *Bloomfield*, 2025 WL 888476, at *6 ("While 'a plaintiff need only show a limited amount of control,' 'sparse allegations of agency' that 'shed[] no light on the relationship between' the parent and agent are insufficient." (citation omitted) (first quoting *Protostorm, LLC v. Antonelli*, No. 08-CV-931, 2010 WL 4052922, at *5 (E.D.N.Y. Oct. 14, 2010); and then quoting *Schwab*, 883 F.3d at 86)). "Where . . . the claim is that the foreign corporation is present in New York state because of the activities there of its subsidiary, the presence of the subsidiary alone does not establish the parent's presence in the state." *Jazini*, 148 F.3d at 184 (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)). The "subsidiary must be either an 'agent' or a 'mere department' of the foreign parent." *Id.* (quoting *Koehler v. Bank of Bermuda Ltd.*, 101 F.3d 863, 865 (2d Cir. 1996)).

Plaintiffs' conclusory allegations that PDD admits "Temu is one of '[PDD's] constituent business,'" and that PDD "seeks to invoke the arbitration clause contained in Temu's Terms on the ground that Whaleco is its 'agent,'" (Pls.' MTD Opp'n 34), are insufficient to establish jurisdiction over PDD. Plaintiffs' citations of PDD's public statements, including Securities and Exchange Commission filings, statements from PDD and Temu's websites, and various reported news articles, (Pls.' MTD Opp'n 31–36), do not show that PDD "controlled" Temu, nor does

PDD's admission that Temu is one of its "constituent businesses," (*id.* at 36), demonstrate that PDD purposefully availed itself of New York by "directing its agents or distributors to take action" in New York, *Schwab*, 883 F.3d at 84. *See also Raspberry Holdings LLC v. NextBank Int'l Inc.*, No. 24-CV-1529, 2025 WL 438270, at *7 (S.D.N.Y. Feb. 7, 2025) ("It is not unusual for a subsidiary to have financial and accounting ties to its parent company, or to be functionally organized as part of a division of a parent company. Such facts suggest some level of coordination and that, at least at a high level of generality, the subsidiary is charged with carrying out some of the business of the combined corporation. However, a significantly greater showing of control, and not just coordination, is needed to justify attributing the actions of the subsidiary to the parent for purposes of personal jurisdiction."). Plaintiffs have not sufficiently alleged that PDD has an unusual degree of control over Temu and the Court therefore declines to exercise jurisdiction over PDD under an agency theory. *See Minden Pictures, Inc.*, 738 F. Supp. 3d at 466–68 (concluding the plaintiff did not adequately allege agency jurisdiction where the defendant's declaration stated that they do "not exercise control" over plaintiff, that the defendant "ha[d] no management, authority, or control" over plaintiff, and "d[id] not control a New York based company known as" plaintiff and plaintiff only made general allegations that defendant had the "ability to control and benefit from" plaintiff); *Bayshore Cap. Advisors, LLC*, 667 F. Supp. 3d at 145 (finding the plaintiffs did not allege agency jurisdiction because they "have not alleged that any [d]efendants directed or controlled" the purported agent).

Because the Court finds that there is no personal jurisdiction over PDD under New York's long-arm statute, it need not consider whether exercising personal jurisdiction would comport with constitutional principles of due process. *See Nat'l Union Fire Ins. Co. of Pittsburgh v. UPS Supply Chain Sols., Inc.*, 74 F.4th 66, 73 (2d Cir. 2023) ("Because New York's long-arm statute does not authorize personal jurisdiction over [defendant] in this case, we

need not decide whether exercising such jurisdiction would comport with constitutional due process." (citing *Best Van Lines*, 490 F.3d at 242)), *cert. denied sub nom. UPS Supply Chain Sols., Inc. v. EVA Airways Corp.*, 144 S. Ct. 559, 217 (2024); *Shelbourne Glob. Sols., LLC v. Gutnicki LLP*, 658 F. Supp. 3d 104, 123 (E.D.N.Y. 2023) ("E]xcept where the long-arm statute permits jurisdiction to the extent permitted by principles of Due Process — as it commonly does in states other than New York—analysis under Due Process principles is not necessary unless there is long-arm jurisdiction under the applicable state statute." (citing *Penguin Grp.*, 609 F.3d at 35)).

**ii. General jurisdiction**

"For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *SPV Osus, Ltd. v. UBS AG*, 882 F.3d 333, 343 (2d Cir. 2018) (quoting *Goodyear Dunlop*, 564 U.S. at 923). "In contrast, general jurisdiction over a corporate defendant may be exercised in a [s]tate where the corporation has continuous and systematic contacts so extensive as to render it 'essentially at home,'" such that the corporation may be subject "to jurisdiction by a court in that forum for any claims at all." *Lelchook v. Société Générale de Banque au Liban SAL*, --- F.4th ---, --- , No. 21-975, 2025 WL 2301325, at *7 n.11 (2d Cir. Aug. 11, 2025) (quoting *Goodyear Dunlop*, 564 U.S. at 919); *see also Chufen Chen v. Dunkin' Brands, Inc.*, 954 F.3d 492, 498 (2d Cir. 2020) ("To establish general jurisdiction over a foreign corporation, a plaintiff must set forth facts showing that the "corporation's affiliations with the State are so continuous and systematic as to render it essentially at home in the forum." (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014))); *Yih*, 815 F. App'x at 573 ("[A] court sitting in New York has general personal jurisdiction over a defendant company that has 'engaged in such a continuous and systematic course of doing business [in New York] that a

finding of its presence in [New York] is warranted.'" (second and third alterations in original) (quoting *Landoil Res. Corp. v. Alexander & Alexander Servs., Inc.*, 77 N.Y.2d 28, 33 (1990)); *Johnson v. UBS AG*, 791 F. App'x 240, 243 (2d Cir. 2019) ("Courts 'may assert general jurisdiction over foreign (sister-state or foreign-country) corporations to hear any and all claims against them when their affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State.'" (quoting *Daimler AG*, 571 U.S. at 127)). "[E]xcept in a truly exceptional case, a corporate defendant may be treated as essentially at home only where it is incorporated or maintains its principal place of business." *Chufen Chen*, 954 F.3d at 498 (quoting *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016)); *Johnson*, 791 F. App'x at 243 ("Aside from the truly exceptional case, a corporation is at home and subject to general jurisdiction only in its place of incorporation or principal place of business." (quoting *SPV Osus Ltd.*, 882 F.3d at 343)).

Plaintiffs have failed to allege facts to support an inference that PDD is subject to general jurisdiction in New York. Plaintiffs do not dispute that PDD is a Cayman Islands corporation with a principal place of business in Ireland. (Defs.' MTD Mem. 3; SAC ¶ 32.) Plaintiffs' sparse allegations about PDD's New York activities, as discussed above, do not suggest that this is the "exceptional case" where PDD's contacts with New York are so extensive as to support general jurisdiction in this forum. *See, e.g.*, *Owens v. Ronemus*, No. 23-CV-3036, 2024 WL 3105605, at *7 (S.D.N.Y. June 24, 2024) (explaining that an individual who is a member of the New York bar and a partner at a New York law firm did not present an "exceptional case" where a "non-domiciliary can be regarded as 'at home' . . . for purposes of general jurisdiction"); *Pfaff v. Deutsche Bank AG*, No. 20-25, 2020 WL 3994824, at *5 (S.D.N.Y. July 15, 2020) (concluding a corporate defendant was not subject to general jurisdiction even though it had "offices and

employees in New York" because it was incorporated and had its principal place of business in Germany).

**iii. Rule 4(k)(2)**

Rule 4(k)(2) of the Federal Rules of Civil Procedure provides that "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." Fed. R. Civ. P. 4(k)(2); *Lensky v. Turk Hava Yollari, A.O.*, No. 21-2567, 2023 WL 6173334, at *2 (2d Cir. Sept. 22, 2023) (quoting same). The Second Circuit has explained that under Rule 4(k)(2), "a defendant sued under federal law may be subject to jurisdiction based on its contacts with the United States as a whole, when the defendant is not subject to personal jurisdiction in any state." *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003). Under Rule 4(k)(2)(B), the court must consider whether exercising personal jurisdiction would "comport[] with the Due Process Clause of the Fifth Amendment." *Id.*; *see also Creative Photographers, Inc.*, 763 F. Supp. 3d at 638 ("[Rule 4(k)(2)] 'allows the exercise of personal jurisdiction by a federal district court when three requirements are met: (1) the claim must arise under federal law; (2) the defendant must not be subject to jurisdiction in any state's courts of general jurisdiction; and (3) the exercise of jurisdiction must be consistent with the United States Constitution and laws." (quoting *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008))). "[T]he Due Process Clause of the Fifth Amendment 'permits a court to exercise personal jurisdiction over a non-resident where the maintenance of the suit would not offend traditional notions of fair play and substantial justice.'" *Lensky*, 2023 WL 6173334, at *2 (quoting *Porina*, 521 F.3d at127).

The Second Circuit has established a two-step analysis requiring district courts to first

"ask whether the defendant has sufficient minimum contacts with the forum to justify the court's exercise of personal jurisdiction," where the forum is the "United States in general, rather than with New York in particular." *Id.* (quoting *Porina*, 521 F.3d at 127). "The constitutional minimum contacts inquiry distinguishes between general personal jurisdiction and specific personal jurisdiction relating to 'the United States as a whole.'" *Id.* at 3 (quoting *Dardana*, 317 F.3d at 207). "[I]t is an open question whether general jurisdiction under Rule 4(k)(2)(B) must be determined pursuant to the 'essentially at home' inquiry" or the "continuous and systematic" inquiry — "that is, whether the defendant's contacts with the United States as a whole are 'continuous and systematic' rather than sporadic." *Id.* (quoting *Porina*, 521 F.3d at 128). "[A]s to specific jurisdiction under Rule 4(k)(2)(B), Due Process requires that the defendant takes 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum,' and the plaintiff's claims 'arise out of or relate to the defendant's contacts with the forum' — here the United States." *Id.* (quoting *Ford Motor Co.*, 592 U.S. at 359). If minimum contacts are established, the court then "consider[s] whether the assertion of personal jurisdiction is reasonable under the circumstances of the particular case." *Id.* at 2 (quoting *Porina*, 521 F.3d at 127).

Plaintiffs have not sufficiently alleged that jurisdiction is proper under Rule 4(k)(2). Plaintiffs argue that "many of claims arise under federal law, process was properly served, PDD . . . has not identified another forum in the U.S. where it could be sued, and, personal jurisdiction does not offend due process because PDD has 'purposefully avail[ed] itself of the privilege of conducting activities' within the U.S." (Pls.' MTD Opp'n 40 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).) In support, they argue that PDD "would not be burdened by litigating in this district" because PDD is listed on the NASDAQ in New York, "has entered into contracts requiring litigation in New York, is seeking to invoke [t]erms requiring litigation

in New York, and is defending multiple cases in this district," and that "New York has a significant interest in this case given the unlawful data harvesting from state residents." (*Id.* at 40–41.)

Plaintiffs do not specify if they argue that PDD is subject to either specific or general jurisdiction under Rule 4(k)(2), but regardless, none of Plaintiffs' allegations support specific or general jurisdiction in the United States. First, as the Court has discussed in section II.c.i.3. *supra*, Plaintiffs failed to allege an agency relationship between PDD and Temu, and the Court cannot conclude that PDD has sufficient contacts with the United States through its subsidiary. *See Stutts v. De Dietrich Grp.*, 465 F. Supp. 2d 156, 165–66 (E.D.N.Y. 2006) (finding no Rule 4(k)(2) jurisdiction where "plaintiffs fail to sufficiently allege facts demonstrating such an intimate relationship between" a parent and subsidiary). Second, Plaintiffs' allegations regarding PDD's own contacts are insufficient to subject it to personal jurisdiction under Rule 4(k)(2). PDD's listing on the NASDAQ, unrelated and sporadic banking contracts requiring PDD to litigate disputes in New York, and unrelated ongoing litigation in other courts in New York do not demonstrate that PDD has "continuous and systematic" contacts with the United States that subject it to general jurisdiction or that Plaintiffs have alleged claims arising out of PDD's "purposeful[]" contacts with the United States that subject it to specific jurisdiction. *Lensky*, 2023 WL 6173334, at *3 (first quoting *Porina*, 521 F.3d at 128; and then quoting *Ford Motor Co.*, 592 U.S. at 359); *see Yehuda v. Zuchaer*, No. 22-1972, 2023 WL 8888584, at *3 (2d Cir. Dec. 26, 2023) (explaining that a prior, unrelated lawsuit brought by the defendants in federal court in New York was insufficient to establish personal jurisdiction because the plaintiff's claims did not "arise from" the issues in the prior lawsuit); *V&A Collection, LLC*, 46 F.4th at 132 ("[A] party's consent to jurisdiction in one case [] extends to that case alone. It in no way opens that party up to other lawsuits in the same jurisdiction in which consent was given, where the

party does not consent and no other jurisdictional basis is available." (second alteration in original) (quoting *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50 n.5 (2d Cir. 1991))); *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 97 (2d Cir. 2000) (explaining that "foreign corporations [have] substantial latitude to list their securities on New York-based stock exchanges and to take steps necessary to facilitate those listings (such as making SEC filings and designating a depository for their shares) without thereby subjecting themselves to New York jurisdiction for unrelated occurrences," and "activities necessary to maintain a stock exchange listing do not . . . without more . . . confer jurisdiction"); *Creative Photographers, Inc.*, 763 F. Supp. 3d at 640 ("[M]erely entering into some number of contracts with a domestic company does not make a foreign [company] 'at home' in the forum nor indicate 'continuous and systematic' contact. . . . [including when plaintiff] does not argue that its . . . claims arise from any of [d]efendant's contracts"); *Ziegler, Ziegler & Assocs. LLP v. China Digit. Media Corp.*, No. 05-CV-4960, 2010 WL 2835567, at *4 (S.D.N.Y. July 13, 2010) (explaining that even though "[d]efendant's alleged contacts with New York exceeded mere incidental facilitation of their stock listings" they were not so "continuous and systematic" to subject defendant to jurisdiction in New York).

#### iv. The Court grants Plaintiffs' request for jurisdictional discovery as to PDD

Defendants argue that "Plaintiffs provide no plausible basis to conclude that PDD . . . is subject to personal jurisdiction in New York," or that they would "be able to do so after discovery." (Defs.' MTD. Mem. 29.) They argue that Plaintiffs' arguments are "factually incorrect" and "have been rejected by courts as insufficient as a matter of law." (Defs.' MTD Reply 20.)

Plaintiffs argue that they are entitled to jurisdictional discovery because it "would elicit

additional facts supporting jurisdiction and would be particularly appropriate given that PDD . . . is uniquely in possession of such facts and is 'secretive by culture.'" (Pls.' MTD Opp'n 41 (quoting SAC ¶ 72).) Plaintiffs request discovery on PDD's contacts with the United States, PDD's corporate structure, PDD's control over Whaleco, and PDD's involvement in Temu. (Evans Decl. ¶ 6.)[11]

"A district court has wide latitude to determine the scope of discovery, . . . and is typically within its discretion to deny jurisdictional discovery when the plaintiff [has] not made out a prima facie case for jurisdiction." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 133 n.6 (2d Cir. 2022) (alteration in original) (quoting *Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393, 401 (2d Cir. 2009)); *see also Stutts*, 465 F. Supp. 2d at 169 ("A district court has 'considerable procedural leeway' when deciding a motion to dismiss for lack of personal jurisdiction and 'may permit discovery in aid of the motion.'" (quoting *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 904 (2d Cir. 1981))); *see also Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436 (2d Cir. 2019) ("[T]he district court has considerable latitude in devising the procedures it will follow to ferret out the facts pertinent to jurisdiction." (quoting *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 449 (D.C. Cir. 1990))). "[P]recisely because the plaintiff bears the burden of alleging facts demonstrating standing, [the Second Circuit] ha[s] encouraged district courts to 'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction' where necessary." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 121 (2d Cir. 2025) (first alteration in original) (quoting *Katz*, 872 F.3d at 121); *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003) ("[The] court should take care to

[11] Plaintiffs make two separate requests for discovery: (1) jurisdictional discovery as to PDD, (Pls.' MTD Opp'n 41), and (2) discovery to "test" Defendants' factual assertions regarding the arbitration agreement, (Pls.' MTC Opp'n 31). The Court addresses the arbitration agreement discovery request in section II.d.iv *infra*.

'give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.'" (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000))). The bar for granting "jurisdictional discovery" is "low," *Universal Trading*, 560 F. App'x at 55, and it is appropriately granted where a plaintiff's allegations make a "sufficient start" toward establishing personal jurisdiction, *Uebler v. Boss Media, AB*, 363 F. Supp. 2d 499, 506 (E.D.N.Y. 2005). However, "if the plaintiff has failed to establish a prima facie case for personal jurisdiction, jurisdictional discovery is generally not granted." *Reed Int'l, Inc. v. Afg. Int'l Bank*, 657 F. Supp. 3d 287, 298 (S.D.N.Y. 2023) (quoting *RSM Prod. Corp. v. Fridman*, 643 F. Supp. 2d 382, 402 (S.D.N.Y. 2009), *aff'd*, 387 F. App'x 72 (2d Cir. 2010)); *see also Beierwaltes v. L'Office Federale De La Culture De La Confederation Suisse*, 999 F.3d 808, 828 (2d Cir. 2021) ("A court . . . does not abuse its discretion in denying jurisdictional discovery 'if the party seeking discovery cannot articulate a reasonable basis for the court first to assume jurisdiction.'" (quoting *Arch Trading Corp. v. Republic of Ecuador*, 839 F.3d 193, 206–07 (2d Cir. 2016))). "If a plaintiff has identified a genuine issue of jurisdictional fact, jurisdiction[al] discovery is appropriate even in the absence of a *prima facie* showing as to the existence of jurisdiction." *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 760 (S.D.N.Y. 2004); *see Tex. Int'l Magnetics, Inc. v. Auriga-Aurex, Inc. (In re Magnetic Audiotape Antitrust Litig.)*, 334 F.3d 204, 207–08 (2d Cir. 2003) (per curiam). "However, a court is not obligated to subject a foreign corporation to discovery where the allegations of jurisdictional facts . . . fail to state a basis for the exercise of jurisdiction or where a plaintiff's proposed discovery, if granted, would not uncover facts sufficient to sustain jurisdiction," *Daventree Ltd.*, 349 F. Supp. 2d at 761 (first citing *Jazini*, 148 F.3d at 185–86; and then citing *APWU*, 343 F.3d at 627), and "discovery need not be granted to permit a fishing expedition for jurisdictional facts," *Greer v. Carlson*, No. 20-CV-5484, 2020 WL 6064167, at *5 (S.D.N.Y. Oct. 14, 2020) (citing *RSM Prod.*

*Corp.*, 643 F. Supp. 2d at 402).

The Court grants Plaintiffs limited jurisdictional discovery to determine PDD's relationship with Whaleco and Temu. As noted above, the parties submitted conflicting affidavits about various aspects of PDD's involvement in Whaleco and Temu, and discovery is therefore appropriate to resolve these contested facts, particularly given that certain aspects of PDD's corporate structure "are peculiarly within the knowledge" of PDD. *Togut v. Forever 21, Inc.*, 285 F. Supp. 3d 643, 649 (S.D.N.Y. 2018) (quoting *Gualandi v. Adams*, 385 F.3d 236, 244 (2d Cir. 2004)); *see also Blockchange Ventures I GP, LLC v. Blockchange, Inc.*, No. 21-CV-891, 2021 WL 3115437, at *5 (S.D.N.Y. July 22, 2021) (permitting limited jurisdictional discovery where "disagreements present[ed] genuine disputes of jurisdictional fact").[12]

After Plaintiffs and PDD have concluded discovery aimed at determining and resolving disputes regarding PDD's relationship with Whaleco and Temu, Plaintiffs shall submit to the Court the information they believe establishes the Court's personal jurisdiction over PDD. If PDD believes that Plaintiffs still fail to establish personal jurisdiction after discovery, PDD may renew its motion to dismiss on that basis.

#### d. The Court grants Defendants' motion to compel arbitration of the Users' and Minors' claims against Temu

Defendants argue that the Users Class' claims are subject to the arbitration agreement in the Terms.[13] First, Defendants argue that the Users Class "agreed to arbitrate their claims" after

[12] The parties are respectfully referred to Magistrate Judge Robert M. Levy for a determination as to the scope of Plaintiffs' jurisdictional discovery as to PDD. The Court also respectfully recommends that Judge Levy supervise the discovery process.

[13] Defendants "contest[] that the Court has personal jurisdiction over PDD . . . , but in the alternative, argues that PDD . . . should be entitled to enforce the arbitration and class action waiver in the Terms." (Defs.' MTC Mem. 17 n.8.) As discussed above in section II.c. *supra*, the Court concludes that it lacks personal jurisdiction over PDD and orders limited jurisdictional

a "Registration [Screen] inform[ed] them that, by continuing [to use the Temu App], they would be agreeing to the terms." (Defs.' MTC Mem. 9.) Defendants contend that the Registration Screen "is in a format that Second Circuit courts," including this Court, "have held is sufficient to form a valid agreement." (*Id.*) They note that in the *Hu* litigation, the Court "explained in detail why the Registration [Screen] provided reasonably conspicuous notice to Temu users," and that, by clicking one of the "Continue" buttons on the Registration Screen, Users "unambiguously manifested assent to the Terms . . . [and] entered into an agreement to arbitrate," including delegating questions of arbitrability and enforceability to the arbitrator. (*Id.* at 10; *see also* Defs.' MTC Reply 1–12.) Second, Defendants argue that the Minor Users are bound by the Terms. In support, they contend that "contracts with minors are, at most, voidable (not void)" and the Minor Users' attempt to disaffirm or disavow their agreements with Temu are "a defense to the *enforceability* of the agreement" that is subject to arbitration. (Defs.' MTC Mem. 10–13; *see also* Defs.' MTC Reply 12–17.) They also argue that if the Minor Users improperly accessed another user's account, the Minor Users are "estopped from disclaiming the contract to which the account-holder agreed" because they "knowingly accesse[d] and benefit[ted] from another's account." (Defs.' MTC Mem. 11, 14–16.)

---

discovery as to PDD's contacts with New York. Because personal jurisdiction is a prerequisite to the Court deciding Defendants' motion to compel, the Court analyzes the motion to compel as to the claims the Users and Minors brought against Temu only. *See, e.g.*, *BRM Trades, LLC v. All-Ways Forwarding Int'l, Inc.*, No. 21-CV-7151, 2022 WL 2788087, at *5, *9 (S.D.N.Y. July 15, 2022) (granting defendant's motion to compel arbitration after concluding the court had personal jurisdiction over defendant and denying its motion to dismiss for lack of personal jurisdiction); *Gilbert v. Indeed, Inc.*, 513 F. Supp. 3d 374, 411, 418 (S.D.N.Y. 2021) (dismissing claims against a party for lack of personal jurisdiction and declining to address their alternative argument to compel arbitration); *Nat'l Union Fire Ins. Co. of Pittsburgh v. Wynn Las Vegas, LLC*, 509 F. Supp. 3d 38, 52 (S.D.N.Y. 2020) (granting motion to compel arbitration and concluding the court has personal jurisdiction over defendant). The Court declines to address PDD's argument that it can enforce the arbitration agreement under an estoppel theory pending the resolution of PDD's motion to dismiss for lack of personal jurisdiction.

Plaintiffs argue that the Court should not grant Defendants' motion to compel arbitration for several reasons. First, they argue that the arbitration agreement and the clause delegating questions of arbitrability and enforceability to the arbitrator are unconscionable. (Pls.' MTC Opp'n 3–10.) Second, they argue that arbitration would deprive Plaintiffs of federal remedies to which they are entitled. (*Id.* at 10–12.) Third, Plaintiffs argue that they do not have a valid arbitration agreement with Defendants. In support, they argue that (i) a lack of mutual assent precluded formation of an agreement; (ii) Defendants failed to provide clear and conspicuous notice of the Terms; and (iii) the Terms and collateral estoppel bar arbitration. (*Id.* at 12–17.) Fourth, they contend that the delegation clause and arbitration agreement do not apply to this dispute. (*Id.* at 17–19.) Fifth, they argue that the Minor Users' claims cannot be arbitrated, because the Minor Users did not agree to arbitrate, disaffirmed any alleged agreement, and that some of the Minor Users never created an account and never entered into any agreement with Defendants. (*Id.* at 19–28.)

**i. The Users and Minors executed a valid arbitration agreement**

The Court addresses Plaintiffs' arguments that the arbitration agreement in general and the delegation clause in particular are unconscionable, and then considers Plaintiffs' arguments that they did not assent to the arbitration agreement and that their claims are beyond the scope of the arbitration agreement.

**1. Plaintiffs fail to challenge the delegation clause and questions of arbitrability are delegated to the arbitrator**

Defendants argue that the arbitration agreement and delegation clause are not unconscionable. First, Defendants argue that Plaintiffs' attempt to reframe their arguments about the enforceability of the delegation clause as challenges to the delegation clause itself are futile. (Defs.' MTD Reply 2–4.) Second, Defendants argue that the delegation clause is not

procedurally or substantively unconscionable. (*Id.* at 4–10.) In support, they argue that the arbitration clause is not internally inconsistent and Defendants do not attempt to unilaterally and retroactively apply updated Terms to Plaintiffs in this case. (*Id.* at 4–5.) They also argue that the Informal Dispute Resolution process is not "one-sided," and that the arbitration demand and batch arbitration provision are not confusing, unfair, or otherwise prejudicial to Plaintiffs. (*Id.* at 6–9.) They contend that Plaintiffs cite no law supporting their proposition that the FAA does not authorize batch arbitration. (*Id.* at 10.)

Plaintiffs argue that the arbitration agreement, and the delegation clause in particular, are unconscionable. First, they argue that the delegation clause is procedurally unconscionable because the batch arbitration provision is confusing, requires users to "follow a hyperlink to the Terms containing the arbitration clause" and then "follow yet another link to the AAA's website" to ascertain "which rules govern," and then "find another link" to the consumer arbitration rules, which are inconsistent with the arbitration agreement, and because Defendants "gave themselves the unilateral right to amend the Terms." (Pls.' MTC Opp'n 4–5.) Second, they argue that the arbitration clause is substantively unconscionable because the Informal Dispute Resolution process, the arbitration demand, and batch arbitration requirement "would require millions of individual consumers to jump through a series of costly, time-consuming, and one-sided procedures design to frustrate consumers' ability to recover." (*Id.* at 6–10.) Third, they argue that the FAA does not authorize batch arbitration and that the batch arbitration provisions are procedurally and substantively unconscionable. (*Id.* at 7–9, 10.)

As the Court explained in the *Hu* litigation, "section 20.7 of the Terms provides 'clear and unmistakable evidence' that the parties agreed to arbitrate" questions of arbitrability. *Hu*, 2024 WL 4481439, at *19. Section 20.7 provides that the arbitrator has "exclusive authority" to resolve disputes "arising out of or related to the interpretation or application of the Arbitration

Agreement, including the enforceability, revocability, scope, or validity of the Arbitration Agreement." (Terms § 20.7.) The Court explained that it is well-established that such "broad delegation clauses provide clear and unmistakable evidence of the parties' intent to delegate" arbitrability. *Hu*, 2024 WL 4481439, at *19. The Supreme Court has instructed that "if a valid agreement exists, and if the agreement delegates the arbitrability issue to an arbitrator, a court may not decide the arbitrability issue." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 69 (2019). The Court accordingly concluded that because no party or amici challenged the delegation clause itself, the Court must treat the delegation clause as valid and defer questions of arbitrability to the arbitrator. *Hu*, 2024 WL 4481439, at *20.

Plaintiffs' current attempt to characterize their challenges to the arbitration agreement as challenges to the delegation clause itself are unavailing. Plaintiffs extensively rely on *Heckman v. Live Nation Entertainment, Inc.*, including for the proposition that a party may challenge "the enforceability of a delegation clause by explaining how 'unrelated' provisions make the delegation unconscionable." 120 F.4th 670, 680–81 (9th Cir. 2024) (quoting *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023)). In *Heckman*,[14] the Ninth Circuit determined that a party arguing that a delegation clause is unconscionable because of unrelated provisions must also explain how those provisions relate to unconscionability. *Id.* Plaintiffs in this case offer no such explanation but, as Defendants argue, "simply attempt to portray . . . challenges [to the arbitration agreement] as challenges to the delegation provision — without providing a satisfactory explanation of how that is so." (Defs.' MTC Reply 2.) For example, Plaintiffs argue that the delegation clause is procedurally unconscionable because "the arbitration clause is . . . riddled with internal inconsistencies" and disadvantages users because it gives

[14] As a preliminary matter, the Court is not bound by out-of-circuit decisions, and *Heckman* applied California state contract law rather than New York state contract law. *Id.*

Defendants "the unilateral right to amend the Terms," (Pls.' MTC Opp'n 4–5), but do not explain how those arguments relate to the alleged procedurally unconscionability of the delegation clause. Plaintiffs also argue that the delegation clause is substantively unconscionable because the Informal Dispute Resolution process "functions as a bottleneck to the resolution of claims" and improperly requires users but not Defendants to participate, imposes "onerous requirements for the arbitration demand" such as "requiring a statement of the legal claims being asserted and the factual bases for them," and a batch arbitration provision that "disadvantage[s] consumers in multiple ways." (*Id.* at 6–9.) Plaintiffs do not explain, nor can the Court discern, how those parts of the arbitration agreement bear on the unconscionability of the delegation clause itself. Plaintiffs raised similar arguments as amici in the *Hu* litigation, which the Court determined were challenges to the arbitration agreement rather than the delegation clause. *Hu*, 2024 WL 4481439, at *20 ("Although Amici challenge various aspects of the arbitration agreement, such as arguing that the batch arbitration clause and various procedural prerequisites to arbitration are substantively unconscionable, they do not specifically challenge the delegation clause." (citation omitted)). Because Plaintiffs do not actually challenge the validity of the delegation clause, the Court must treat the clause as valid and enforceable.[15] *See Davitashvili*, 131 F.4th at 118–19

[15] In their supplemental briefing, Plaintiffs argue that developments in a recently filed case before the Court, *McMahan v. Whaleco, Inc.*, No. 25-CV-1590 (E.D.N.Y.) (the "*McMahan* litigation"), show that the arbitration agreement is "unconscionable, unworkable, and so vague and inconsistent that there could be no mutual agreement to arbitrate" and that the arbitration agreement is therefore void. (Pls.' Suppl. MTC Opp'n MTC 1, 6.) Plaintiffs contend that Defendants make inconsistent arguments in the *McMahan* litigation about what constitutes a "condition precedent to arbitration." (*Id.* at 8 n.3.) They argue that because Defendants contend in the *McMahan* litigation that conditions precedent to arbitration are issues for a court to decide, (*id.*), they cannot argue in this case that conditions precedent to arbitration are issues for the arbitrator. However, Plaintiffs mischaracterize issues of unconscionability and vagueness as "conditions precedent to arbitration." As the Court explained at length in the *Hu* litigation and in section II.d.i.2–iii *infra*, Plaintiffs' arguments about unconscionability and vagueness are not conditions precedent to arbitration but are questions properly delegated to the arbitrator based on

(explaining that because "plaintiffs fail to challenge the clause with sufficient specificity" and argue only "that arbitration *in general* would be unconscionable," plaintiffs' claims against defendants "should be sent to an arbitrator to determine whether those claims are arbitrable"); *Vasell v. SeatGeek, Inc.*, No. 24-CV-932, 2025 WL 240912, at *9 (E.D.N.Y. Jan. 17, 2025) (explaining "[a]bsent allegations or evidence suggesting" that the delegation provision "is invalid or inapplicable — which plaintiffs do not raise and the [c]ourt does not discern based on the record before it — the arbitrability of [plaintiffs'] claims is also clearly a question for arbitration."); *Lin v. DISH Network*, No. 19-CV-1087, 2020 WL 13845109, at *4 (E.D.N.Y. Feb. 5, 2020) ("Because the plaintiff does not challenge the enforceability of the delegation clause, the Court must treat it as valid, enforce it and leave the plaintiff's enforceability challenges for the arbitrator."); *Vargas v. Bay Terrace Plaza LLC*, 378 F. Supp. 3d 190, 196 (E.D.N.Y. 2019) ("[T]he law is clear that absent a specific challenge, the delegation of the questions of unconscionability and enforceability of an arbitration agreement to an arbitrator must be upheld. (citations omitted)).

**2. The Users and Minors agreed to arbitrate Temu's claims**

Defendants argue that Temu Users "agree[d] to arbitrate their disputes with Temu." (Defs.' MTC Reply 1; *see also* Defs.' MTC Mem. 9–10.) They argue that Plaintiffs' privacy claims fall under the Terms' agreement to arbitrate claims "relating in any way to your access to or use of [Temu]." (Defs.' MTC Reply 11.)

Plaintiffs argue that there was no mutual assent to the arbitration agreement, precluding the formation of any agreement. (Pls.' MTC Opp'n 12–13.) Plaintiffs also contend that

---

the parties' valid agreement to arbitrate. In addition, Plaintiffs provide no support for their argument that the Court should consider allegations from a complaint in another case in deciding this motion. The Court accordingly declines to further address Plaintiffs arguments with regard to the *McMahan* litigation.

Defendants did not provide them "clear and conspicuous" notice of the Terms necessary "to enter into a binding online agreement." (*Id.* at 13–15.) They argue in the alternative that the delegation clause does not apply to this dispute and the claims are not arbitrable. (*Id.* at 17–19.)

The Terms and Registration Screen in this case are identical to the Registration Screen in the *Hu* litigation. The Court previously examined both the Terms and the Registration Screen in detail and explained at length that the arbitration agreement is valid. *Hu*, 2024 WL 4481439, at *10–18. The Court found that "[p]laintiffs unambiguously manifested assent to the Terms" because the Registration Screen was a "clear prompt directing users to read the [Terms]" and signaled "that their acceptance of the benefit of registration would be subject to contractual terms." *Id.* at *16 (citing *Meyer*, 868 F.3d at 79). The Court also concluded that plaintiffs had "clear and conspicuous" notice of the Terms because the "Registration Screen appears relatively uncluttered, is visible at once, and the notice and bolded hyperlinks are spatially and temporally coupled with a user's creation of an account." *Id.* at *12–15. Plaintiffs identify no basis for the Court to depart from the conclusion that the arbitration agreement is valid and the Court declines to do so.

In addition, Plaintiffs' argument that their claims fall outside of the scope of the arbitration agreement is unavailing. It is well-settled that if a contract "delegates the arbitrability question to an arbitrator, a court may not override the contract" and "possesses no power to decide the arbitrability issue." *Henry Schein, Inc.*, 586 U.S. at 68. As the Supreme Court explained, "a court may not 'rule on the potential merits of the underlying' claim that is assigned by contract to an arbitrator, 'even if it appears to the court to be frivolous.'" *Id.* (quoting *AT&T Techs., Inc. v. Commc'ns Workers*, 475 U.S. 643, 649–50 (1986)). "A court has 'no business weighing the merits of the grievance' because the 'agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.'" *Id.* at 68–69 (quotation

marks omitted) (quoting *AT&T Techs., Inc.*, 475 U.S. at 650). The Court concluded that the arbitration agreement delegated questions of arbitrability to the arbitrator, *see* section II.d.i.1 *supra*, and the delegation clause by its terms gives the arbitrator exclusive authority to resolve disputes "arising out of or related to the . . . scope" of the arbitration agreement, (Terms § 20.7). The Court must treat the delegation clause and arbitration agreement as valid and declines to consider whether Plaintiffs' claims are within the scope of the agreement, as that question is delegated to the arbitrator.[16] *See Awad v. Extended Nursing Pers.*, No. 24-CV-2117, 2025 WL 753865, at *5 (S.D.N.Y. Mar. 10, 2025) (explaining that questions about the scope of the arbitration agreement are delegated to the arbitrator where the agreement provides that the arbitrator "shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement" (citation omitted)); *Alvarez v. Experian Info. Sols., Inc.*, 661 F. Supp. 3d 18, 28 (E.D.N.Y. 2023) (magistrate judge decision explaining that because "questions of arbitrability raised by the parties are properly for the arbitrator and not this [c]ourt," the court's "inquiry can go no further," "notwithstanding [p]laintiff's protests that his dispute is not encompassed by the [a]rbitration [a]greement"), *aff'd*, No. 19-CV-3343, 2024 WL 3643269 (E.D.N.Y. Aug. 2, 2024) (affirmed by district judge); *Chung Chang v. Warner Bros. Ent.*, No. 19-CIV-2091, 2019 WL 5304144, at *5 (S.D.N.Y. Oct. 21, 2019) (declining to "address whether some of [plaintiff's] claims are beyond the scope of the

[16] Plaintiffs argue that the delegation clause "expressly excludes disputes like this one" because it excludes disputes "arising out of or related to Section 20.4," which is the "Waiver of Class and Other Non-Individualized Relief" provision, as well as disputes "about whether either party has satisfied any condition precedent to arbitration." (Pls.' MTC Opp'n 18–19 (citing Terms § 20.4).) Plaintiffs do not separately challenge the class action waiver provision in Section 20.4 and thus their claims are not excluded from arbitration on that basis. In addition, the Court explained in section II.d.i.1., *supra*, that the parties delegated questions of arbitrability to the arbitrator, including arguments that the arbitration agreement is unconscionable. Accordingly, Plaintiffs' claims about the scope of the arbitration agreement are properly delegated to the arbitrator.

[a]greement" because the agreement specified that "[a]ny question concerning the arbitrability of any claim or issue . . . shall be resolved by the arbitrator" (third alteration in original)).

**ii. Plaintiffs' remaining challenges to the arbitration agreement fail**

The Court considers Plaintiffs' challenges that (1) the arbitration agreement is void under the Terms' plain language, (2) Defendants are collaterally estopped from enforcing the agreement, and (3) the agreement deprives Plaintiffs of federal remedies.

**1. The arbitration agreement is not void under the plain language of the Terms**

Plaintiffs argue that Defendants cannot compel arbitration because "the arbitration clause itself precludes arbitration if the batch arbitration provision is deemed invalid or unenforceable, as three courts have held." (Pls.' MTC Opp'n 16.) They argue that the courts in *Smith* and *Eakins* held that "the parties did not enter into a valid and binding arbitration agreement" and thus, the "batch arbitration provision (and the rest of the Terms)" is invalid. (*Id.* (emphasis omitted) (first citing *Smith v. Whaleco*, No. 23-CV-559, 2024 WL 3513800 (W.D. Okla. July 23, 2024); and then citing *Eakins v. Whaleco, Inc.*, 721 F. Supp. 3d 1252, (W.D. Okla. 2024)).

Plaintiffs merely repeat the same arguments the Court has already considered in *Hu*. As the Court explained in detail in the *Hu* litigation, *Smith* and *Eakins* "did not find that the batch arbitration clause was 'invalid' or 'unenforceable' but rather that no valid agreement was formed between Temu App users and [Temu] because the users did not have inquiry notice of the Terms." *Hu*, 2024 WL 4481439, at *6. The Court emphasized that neither the *Smith* nor the *Eakins* court "reproduced or analyzed the Terms' provisions, generally, or the batch arbitration clause, specifically" and therefore those courts did not "trigger[] Section 20.11's invalidity clause." *Id.* The Court concluded that "the arbitration agreement is not void under the plain

language of the Terms" and that Defendant could seek to compel arbitration. *Id.* The Court finds no reason, and Plaintiffs have provided no facts or legal arguments, to alter that conclusion.

**2. Collateral estoppel does not bar Defendants from compelling arbitration**

Plaintiffs argue that three district court decisions invalidating the arbitration agreement collaterally estop the Court from enforcing the arbitration agreement in this case. (Pls.' MTC Opp'n 16–17.) They argue that Defendants did not establish that it would be "unfair to apply collateral estoppel due to alleged inconsistency between a Florida state court decision and the three federal decisions denying arbitration." (*Id.* at 17.) In support, they argue it would not be "unfair" to apply collateral estoppel and deny Defendants' motion to compel arbitration because Defendants had "full 'incentive to raise [the issue] in the earlier action[s],'" "there were no 'procedural opportunities unavailable in the [prior] action[s] that could readily cause a different result'" in this case, and "the weight of authority . . . is against arbitration." (*Id.* (first quoting *Dish Network Corp. v. ACE Am. Ins. Co.*, 431 F. Supp. 3d 415, 427 (S.D.N.Y. 2019); and then quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 331 (1979)).)

Plaintiffs repeat arguments the Court analyzed and found unpersuasive in *Hu*. In *Hu*, the Court considered Plaintiffs' argument that collateral estoppel bars Defendants from compelling arbitration, and explained that "even if the four prongs of the nonmutual offensive collateral estoppel analysis were satisfied, applying the doctrine to bar [Temu] from attempting to enforce the Terms and compel arbitration would be unfair because at least one other court has granted [Temu's] motion to compel based on the Terms at issue in this action."[17] *Hu*, 2024 WL

[17] The four elements of nonmutual offensive collateral estoppel are:

> (1) the issues in both proceedings must be identical; (2) the issue in the prior proceeding must have been actually litigated and actually decided; (3) there must have been a full and fair opportunity for

4481439, at *9. The Court explained that the facts in the Florida state case "do not sufficiently distinguish it" from the federal district court decisions and accordingly declined to apply collateral estoppel. *Id.* at *9 & *9 n.8. Plaintiffs have offered no new facts or arguments to persuade the Court to apply collateral estoppel in this case.

**3. The arbitration agreement does not deprive Plaintiffs of federal remedies**

Plaintiffs argue that the arbitration agreement is invalid because it "impairs statutory rights" and Plaintiffs' ability to recover "attorney[s'] fees, punitive damages, and public injunctive relief."[18] (Pls.' MTC Opp'n 10–12.)

Defendants argue that Plaintiffs mischaracterize the Terms and that they do not prevent Plaintiffs from seeking properly awarded attorneys' fees or public and individual injunctive relief. (Defs.' MTC Reply 9–10.)

---

> litigation in the prior proceeding; and (4) the issue previously litigated must have been necessary to support a valid and final judgment on the merits.

*Clark v. Hanley*, 89 F.4th 78, 100 n.28 (2d Cir. 2023) (quoting *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 304 (2d Cir. 1999)); *Bifolck v. Philip Morris USA Inc.*, 936 F.3d 74, 79–80 (2d Cir. 2019) (quoting *Faulkner v. Nat'l Geographic Enters. Inc.*, 409 F.3d 26, 37 (2d Cir. 2005)); *United States v. Dominguez*, 712 F. App'x 100, 102 (2d Cir. 2018) (quoting *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 44 (2d Cir. 1986)).

[18] Plaintiffs argue that the Second Circuit "recently rejected arbitration on similar grounds" in *Cedeno v. Sasson*, 100 F.4th 386 (2d Cir. 2024), and *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Practice P.C.*, 120 F.4th 59 (2d Cir. 2024). (Pl.'s Opp'n 1.) Their reliance on *Cedeno* and *State Farm* is misplaced. In *Cedeno*, the Second Circuit concluded that provisions of an arbitration agreement prevented individuals from "pursuing the substantive statutory remedies available to them under" the Employee Retirement Income Security Act. *Cedeno*, 100 F.4th at 400, 408. In *State Farm*, the Second Circuit explained that the "'effective vindication' exception applies in rare cases where an arbitration agreement 'prevent[s] parties from effectively vindicating their statutory rights" and that the exception applied in that case because there were "thousands of arbitrations . . . demonstrat[ing] a pattern of baseless and repetitive claims" that prevented defendants from resolving their claims. *State Farm*, 120 F.4th at 91. Plaintiffs do not show that they have a "rare case" such that they cannot "effectively vindicate" their rights under the arbitration agreement. Neither case supports Plaintiffs' argument that the arbitration agreement is improper.

The Court is not persuaded by Plaintiffs' argument that the arbitration agreement is invalid because it deprives them of federal remedies such as attorneys' fees, punitive damages, and public injunctive relief. The plain language of the Terms restricts recovery for "any indirect, incidental, consequential, special, exemplary or punitive damages of any kind" to the "fullest extent permitted by applicable law." (Terms § 16.1; Defs.' MTC Reply 10.) Plaintiffs thus incorrectly argue that the Terms prohibit them from recovering damages. (Pls.' MTC Opp'n 10–12.) The Terms also do not prevent Plaintiffs from being awarded attorneys' fees, but rather provide that the "parties shall bear their own attorneys' fees and costs in arbitration unless the arbitrator finds that either the substance of the [d]ispute or the relief sought in the [r]equest was frivolous or was brought for an improper purpose," that "the party that obtains an order compelling arbitration in [an] action [invoking the authority of a court to compel arbitration] shall have the right to collect from the other party its reasonable costs, necessary disbursements, and reasonable attorneys' fees," and that "[t]he prevailing party in any court action relating to whether either party has satisfied any condition precedent to arbitration, including the Informal Dispute Resolution [p]rocess, is entitled to recover their reasonable costs, necessary disbursements, and reasonable attorneys' fees and costs." (Terms § 20.8.) Courts in the Second Circuit have not invalidated arbitration agreements based on such fee-shifting clauses.[19] *See,*

---

[19] Courts are more likely to invalidate attorneys' fees-shifting provisions in arbitration agreements in the context of civil rights and employment laws. The Second Circuit has cautioned that a "fee-shifting provision that requires that fees be awarded to the prevailing party . . . would significantly diminish a litigant's rights under Title VII" and would thus be substantively unconscionable. *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 125–26 (2d Cir. 2010). The Second Circuit explained that it is "very rare that victorious defendants in civil rights cases will recover attorneys' fees" and that the Supreme Court has only held that a defendant in a Title VII case shall be awarded attorneys' fees if a plaintiff's claim was "frivolous, unreasonable or groundless." *Id.* at 126 (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 178 (2d Cir. 2006)); *see also Gilbert*, 513 F. Supp. 3d at 406 ("The attorneys' fees provisions of Title VII were enacted 'broadly, to encourage individuals injured by . . .

*e.g.*, *Jones v. Landry's, Inc.*, No. 23-CV-9920, 2025 WL 1527307, at *6–7 (S.D.N.Y. May 29, 2025) (declining to invalidate an arbitration agreement based on the plaintiff's argument that the fee-shifting and fee-splitting provisions of the arbitration clause were unconscionable); *Silva v. Schmidt Baking Distrib., LLC*, 732 F. Supp. 3d 194, 212 (D. Conn. 2024) ("[T]he arbitration agreements' cost- and fee-shifting provisions are not substantively unconscionable and will not bar application of the delegation clause."), *motion to certify appeal on other grounds granted*, No. 23-CV-1695, 2024 WL 3566168 (D. Conn. July 29, 2024); *Billie v. Coverall N. Am., Inc.*, 444 F. Supp. 3d 332, 353–54 (D. Conn. 2020) ("[P]laintiffs do not identify a single Second

---

discrimination to seek judicial relief.'" (quoting *Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 402 (1968) (discussing Title II))). Similarly, district courts in the Second Circuit have found fee-shifting provisions invalid when plaintiffs bring claims under the Fair Labor Standards Act (the "FLSA") because requiring losing defendants to pay attorneys' fees encourages "private attorneys general" to enforce the FLSA. *Crespo v. Kapnisis*, No. 21-CV-6963, 2022 WL 2916033, at *5 (E.D.N.Y. July 25, 2022) (quoting *Trinidad v. Pret a Manger (USA) Ltd.*, No. 12-CV-6094, 2014 WL 4670870, at *12 (S.D.N.Y. Sept. 19, 2014)). Plaintiffs have not identified any persuasive case law that the fee-shifting provision in this case "significantly diminish[es]" their rights under either the Computer Fraud and Abuse Act or the Electronic Communications Privacy Act, *Ragone*, 595 F.3d at 126, nor have they identified any cases suggesting that the attorneys' fees provisions of the Computer Fraud and Abuse Act or the Electronic Communications Privacy Act are integral to the enforcement of those laws.

Moreover, Plaintiffs assert that the Terms "impos[e] costs that make arbitration prohibitively expensive," (Pls.' MTC Opp'n 11), but fail to allege factual support. *Vidal v. Advanced Care Staffing, LLC*, No. 22-CV-5535, 2023 WL 2783251, at *19 (E.D.N.Y. Apr. 4, 2023) ("[I]ndividualized prohibitive expense[s] that consider[] factors including the financial means of plaintiff and the cost differential between arbitration and litigation in court." (quoting *Valle v. ATM Nat., LLC*, No. 14-CV-7993, 2015 WL 413449, at *6–7 (S.D.N.Y. Jan. 30, 2015)). Plaintiffs have not alleged with any specificity that the arbitration agreement is prohibitively expensive given the size of their claims and the cost of litigation. The Court thus declines to invalidate the arbitration agreement on the unsupported basis that arbitration is prohibitively expensive. *See, e.g.*, *Petry v. AAM Holding Corp.*, No. 22-CV-3110, 2025 WL 1194739, at *6 (S.D.N.Y. Apr. 3, 2025) (rejecting plaintiffs' argument that the arbitration agreement should be severed because plaintiffs do not provide evidence that "financial hardship . . . will result from arbitration"), *report and recommendation adopted*, 2025 WL 1194336 (S.D.N.Y. Apr. 22, 2025); *cf. Vidal*, 2023 WL 2783251, at *19 (finding that plaintiff "made a sufficient showing" that an attorneys' fees-shifting provision was substantively unfair where he specified that "even challeng[ing] the threshold issues of arbitrability before the arbitrator" would cost over $10,000 and plaintiff earned $4,500 per month after taxes and incurs monthly expenses of $3,850).

Circuit [opinion] . . . that has invalidated an agreement to arbitrate based on the inclusion of a fee-shifting clause."); *Crispin Porter & Bogusky LLC v. Watson*, No. 18-CV-384, 2019 WL 5079916, at *4 (S.D.N.Y. Oct. 10, 2019) (enforcing a motion to compel arbitration where the plaintiff argued without support that the arbitration agreement's fee-shifting provision was unenforceable). In addition, even if any or all of the arbitration agreement provisions Plaintiffs contend impair certain federal and state statutory rights, and Plaintiffs' ability to recover attorneys' fees, or seek public injunctive relief were unconscionable, they could be severed from the agreement and the remaining arbitration agreement would remain valid. *See Am. Fam. Life Assurance Co. of N.Y. v. Baker*, 848 F. App'x 11, 13 (2d Cir. 2021) (explaining that the "correct remedy under New York law" for an unconscionable provision "would be to sever" the provision "and enforce the [a]greement's remaining terms" because New York courts "generally honor 'the state and federal policy favoring arbitration by 'sever[ing] the improper provision of the arbitration agreement, rather than void[ing] the entire agreement,'" particularly "where, as here, the contract contains a severability clause directing this approach" (quoting *Ragone*, 595 F.3d at 125)); *Ragone*, 595 F.3d at 124–25 (explaining that New York law "directs that the appropriate remedy when a court is faced with a plainly unconscionable provision of an arbitration agreement — one which by itself would actually preclude a plaintiff from pursuing her statutory rights — is to sever the improper provision of the arbitration agreement, rather than void the entire agreement." (internal quotation marks omitted) (quoting *Brady v. Williams Cap. Grp., L.P.*, 878 N.Y.S.2d 693, 701 (App. Div. 2009))). Plaintiffs do not contend that the provisions they object to "go to the core of the arbitration agreement" or are part of an "'integrated scheme to contravene public policy' such that the offending provision[s] [are] not severable." *Am. Fam. Life Assurance Co. of N.Y*, 848 F. App'x at 13 (quoting *Dillon v. BMO Harris Bank, N.A.*, 856

F.3d 330 (4th Cir. 2017)). The Court accordingly concludes that the arbitration agreement does not deprive Plaintiffs of federal remedies and declines to invalidate it on that basis.

**iii. The Minor Users' claims can be arbitrated**

Defendants argue that Minor Users cannot avoid arbitration. First, they argue that the Minor Users do not dispute that they formed a valid arbitration agreement with Temu. (Defs.' MTC Mem. 10) Second, they argue that even if the Minor Users "disavow" their agreements, contracts with minors are voidable, not void, and "disaffirmance is thus a defense to the *enforceability* of the agreement" that is subject to arbitration. (Defs.' MTC Mem. 10–13; Defs.' MTC Reply 13–14.) They also argue that the Minor Users cannot disaffirm the Terms because they benefitted from their Temu accounts and cannot return those benefits. (Defs.' MTC Mem. 13–14; Defs.' MTC Reply 14–16.) Third, they argue that if the Minor Users accessed another user's account, the Minor User is estopped "from disclaiming the contract to which the account-holder agreed." (Defs.' MTC Mem. 11, 14–16; Defs.' MTC Reply 16–17.)

Plaintiffs argue that the Minor Users' claims cannot be arbitrated for several reasons. First, Plaintiffs argue that the Minor Users did not "enter into a valid agreement to arbitrate." (Pls.' MTC Opp'n 19.) In support, they argue that a minor would not be on inquiry notice as to what they were assenting to, particularly because Temu's website lacked "age verification (or inadequate verification)." (*Id.* at 20.) They also argue that Defendants "never offered any agreement to minors" because the Terms prohibit minors from creating accounts with Temu, and therefore "Defendants cannot claim there was any agreement with minor users." (*Id.* at 20–21.) They further contend that applying the arbitration clause to Minor Users would be unconscionable because a "minor could not be expected to understand or agree" to Temu's Terms "in any knowing and voluntary manner." (*Id.* at 21.) Second, Plaintiffs argue that the Minor Users have disaffirmed any alleged agreement with Temu. They contend that the Minor

Users' disavowal of the Terms is not a matter of "enforceability," but whether the contract was "rescinded" or "disaffirmed," which are not covered by the delegation clause. (*Id.* at 22.) They also argue that issues of mental capacity of plaintiffs to enter into agreement are not delegated to arbitrators but are decided by courts "because they relate to contract formation." (*Id.* at 22–23.) Third, Plaintiffs argue that estoppel does not prevent the Minor Users from disaffirming the Terms. They argue that the Minor Users' claims are based on privacy violations rather than the Terms themselves, and therefore the Minor Users did not benefit from their contract with Temu and are not required to arbitrate under the Terms. (*Id.* at 23–24.) They further argue that estoppel theories do not apply where "plaintiffs disaffirm the entire agreement," (*id.* at 24–25), and that even if the estoppel theory applied, the Minor Users did not benefit from the Terms, (*id.* at 25), and New York courts have not barred minors from disaffirming contracts even if they benefitted from the Terms, (*id.* at 25–26.) They also argue that "policy considerations preclude equitable estoppel." (*Id.* at 26.) Fourth, Plaintiffs argue that the Minor Users who did not create Temu accounts did not agree to arbitrate because they never executed Temu's Terms. (*Id.* at 26.) In support, they argue that minors "cannot be bound by contracts signed by third parties," (*id.*), that "courts have rejected efforts to bind non-signatories to arbitration agreements," (*id.* at 27), and that the language of the Terms states that there "are no third-party beneficiaries" to the Terms and thus the Minor Users cannot be bound by the arbitration agreement, and even if they were bound, the Minor Users would be able to disaffirm the agreement, (*id.* at 27–28).

First, the Minor Users who created a Temu account had a valid contractual relationship with Temu. Plaintiffs argue that there was no valid arbitration agreement between the Minor Users and Temu because the Minor Users had inadequate notice of the Terms, lacked mutual assent to the Terms, and the Terms are unconscionable as applied to the Minor Users. (*Id.* at 19–21.) However, the Minor Users alleged that they created and used Temu accounts and received

the benefit of Temu services.[20] (SAC ¶¶ 18, 21, 27, 30, 253–54.) Plaintiffs cannot claim that the Minor Users, after using Temu's services, did not agree to the Terms or the arbitration agreement on the basis of their age alone when they agreed to Temu's Terms when creating their accounts. *See Doe #1 v. Coll. Bd.*, 440 F. Supp. 3d 349, 356–57 (S.D.N.Y. 2020) (finding minor plaintiffs executed a valid arbitration agreement where they did not allege defendant pressured them into accepting the agreement and the terms of the agreement were not "grossly unreasonable" or "outrageous" because they bound "both parties equally to arbitration" (quoting *Suqin Zhu v. Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 392 (S.D.N.Y. 2017))); *I.C. ex rel. Solvosky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) (explaining minor plaintiff could not claim lack of mutual assent to a contract solely on the basis of age); *see also S.T.G. by & through Garcia v. Epic Games, Inc.*, 752 F. Supp. 3d 1200, 1203–04 (S.D. Cal. 2024) (concluding minor users who accepted an "arbitration provision . . . that a user must accept to download Fortnite after first creating an Epic Games account" were bound to arbitrate despite the agreement stating that users "must be an adult" and must have "reached the legal age of majority"); *Ellinghaus v. Educ. Testing Serv.*, No. 15-CV-3442, 2016 WL 8711439, at *7 (E.D.N.Y. Sept. 30, 2016) (explaining that minor plaintiffs' contracts are valid and voidable, not void, if the minor elects to

---

[20] The Court finds Plaintiffs' argument that equitable estoppel does not apply to the Minor Users' claims unavailing for a similar reason. Plaintiffs do not dispute that the Minors were "able to use the Temu service to shop for and purchase goods." (Pls.' MTC Opp'n 23 (quoting Defs.' MTC Mem. 13).) They accordingly obtained a benefit from Temu and cannot disaffirm the Terms while retaining the benefit. *See Ligeri v. Amazon.com Inc.*, No. 23-CV-603, 2024 WL 3638241, at *8 (D. Conn. Aug. 2, 2024) ("[P]laintiffs received a service from Amazon and sought to avoid arbitrating their claims. . . . The plaintiffs themselves derived a benefit from the [arbitration agreement], and this is enough to bind them to the [arbitration agreement]."), *appeal dismissed*, No. 24-2337, 2025 WL 711544 (2d Cir. Feb. 13, 2025); *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 210 (S.D.N.Y. 2015) ("If a minor cannot return the benefits obtained, . . . she 'is effectively precluded from disaffirming the contract in order to get back the consideration' she has given." (quoting *Scott Eden Mgmt. v. Kavoit*, 563 N.Y.S.2d 1001, 1002–03 (Sup. Ct. 1990))).

rescind the contract). Second, the Minor Users cannot avoid arbitration on the sole ground that they were minors when they assented to the arbitration agreement and the Terms. Under New York state law, contracts by minors are voidable, not void. *See, e.g.*, *Spencer-Smith v. Ehrlich*, No. 23-CV-2652, 2024 WL 709291, at *14 (S.D.N.Y. Feb. 21, 2024) ("New York courts have held that 'an infant's contract is voidable and the infant has an absolute right to disaffirm.'" (citation omitted)); *I.C. ex rel. Solovsky v. Delta Galil USA*, 135 F. Supp. 3d 196, 208 (S.D.N.Y. 2015) ("[T]he protection New York law provides to minors is to allow them the right to disaffirm a contract . . . not to find that no enforceable contract exists."); *Hantash v. V Model Mgmt. N.Y., Inc.*, No. 07-3363, 2007 WL 2324326, at *1 (S.D.N.Y. Aug. 7, 2007) ("[I]t is well-settled that 'an infant's contract is voidable and the infant has an absolute right to disaffirm.'" (quoting *Scott Eden Mgmt. v. Kavovit*, 563 N.Y.S. 2d 1001, 1002 (Sup. Ct. 1990))); *Haynes v. Quality Mkts.*, No. 02-CV-250, 2006 WL 8455663, at *7 (W.D.N.Y. Mar. 2, 2006) ("[A]s one noted commentary on New York law recites, infancy does not disable one from entering into contracts, contracts with a minor are not void but are voidable upon the minor's election." (citations omitted)), *report and recommendation adopted*, 2006 WL 8455678 (W.D.N.Y. Mar. 30, 2006), *aff'd*, 307 F. App'x 473 (2d Cir. 2008). Although the Second Circuit has not directly addressed this issue, two circuit courts of appeal have concluded that whether a minor's agreement to a contract is invalid based on their age alone is a question for the arbitrator to decide. *K.F.C. v. Snap Inc.*, 29 F.4th 835, 838 (7th Cir. 2022) ("As long as state law permits a child to ratify a contract, youth must be a defense rather than an obstacle to a contract's formation, and as a defense it goes to the arbitrator."); *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 886 (6th Cit. 2021) (concluding that "plaintiffs' infancy defense is for an arbitrator to decide" because they "simply recycled the same arguments that pertain to the enforceability of the

agreement as a whole" rather than challenging the delegation provision).[21] The Minor Users' claims, including their claims regarding disaffirming their contract with Temu, are thus voidable, rather than void, and their claims relating to the enforceability of the Terms are therefore delegated to the arbitrator. *Meehan v. VIPKid*, No. 20-CV-6370, 2024 WL 277846, at *8 (E.D.N.Y. Jan. 25, 2024) (explaining that "the decision of whether to enforce the arbitration agreement rests with the arbitrator, not the [c]ourt," and that plaintiff "does not claim he was fraudulently induced into signing the arbitration provision itself" and even if plaintiff did have "a viable claim he was fraudulently induced into signing the [agreement] containing the arbitration provision, that decision [should] be made by the arbitrator, not the [c]ourt" (first citing *Adams v. Suozzi*, 433 F.3d 220, 227 (2d Cir. 2005); and then citing *McCaddin v. Se. Marine Inc.*, 567 F. Supp. 2d 373, 378 (E.D.N.Y. 2008))); *N.A. v. Nintendo of Am.*, No. 23-CV-2424, 2023 WL 8587628, at *5 (N.D. Cal. Dec. 11, 2023) ("In sum, N.A. does not argue that the contract to arbitrate was not formed. He asserts that it is voidable because N.A. was a minor when he entered into it. Through the contract, N.A. and Nintendo agreed to arbitrate issues of enforceability, which includes N.A.'s disaffirmation defense. Therefore, the question of disaffirmation must be decided in arbitration."); *A.C. v. Nintendo of Am.*, No. 20-1694, 2021 WL 1840835, at *2 (W.D. Wash. Apr. 29, 2021) ("Minors . . . have the capacity to enter into contracts subject to disaffirmance under both California and Washington law. . . . [Plaintiff] contends that even if the parties formed an agreement to arbitrate, that agreement is not valid

[21] Plaintiffs argue that *K.F.C.* and *In re StockX* "reflect a split of authority" on the mental capacity of a minor to enter into a contract. Plaintiffs cite to the dissenting opinion in *In re StockX* for their argument that "a minor who has disaffirmed a contract is not subject to the contract's delegation provision." 19 F.4th at 887 (Moore, J., dissenting). However, the majority in *In re StockX* agreed with the Seventh Circuit in *K.F.C.* and held that "an arbitrator must adjudicate plaintiffs' infancy defense." *Id.* at 885. Plaintiffs are thus incorrect that *K.F.C.* and *In re StockX* reflect a split of authority.

because he now disaffirms it. The [c]ourt does not reach this issue, however, because, as it does not relate to contract formation, the [c]ourt determines that the parties agreed to have an arbitrator decide it."); *Dowe v. Leeds Brown L., P.C.*, 419 F. Supp. 3d 748, 759 (S.D.N.Y. 2019) ("The plaintiffs make no allegations targeted at the arbitration clause itself" but only argue that the agreement was "tainted . . . as a whole," and thus "[u]nder the Supreme Court's cases, this issue is for the arbitrator to decide."), *aff'd sub nom. Dowe v. Leeds, Morelli & Brown PC*, No. 21-3069, 2023 WL 3986373 (2d Cir. June 14, 2023)); *Morelli v. Alters*, No. 19-CV-10707, 2020 WL 1285513, at *11 (S.D.N.Y. Mar. 18, 2020) ("Plaintiffs do not allege that [defendant] fraudulently induced the arbitration agreement specifically" but allege that the "entire contract was the result of fraudulent inducement. Accordingly, [p]laintiffs' claim of fraudulent inducement is subject to arbitration.").

Third, Plaintiffs' claim that the Minor Users who did not create Temu accounts did not agree to arbitrate because they never executed Temu's Terms is unpersuasive. The Minor Users who used another individual's account represented that they were the account holder and should accordingly be bound to the Terms. *Nicosia*, 384 F. Supp. 3d at 274 ("When one uses an account to transact online, an implicit representation is made that they are the person identified with the account, and thus are bound by the same terms and conditions previously agreed to by the account's true owner. . . . In this case, [p]laintiff's use of the [a]ccount was tantamount to a representation that he *was* [the person named on the account] (and therefore bound by the arbitration provision to which she had previously agreed)."); *see also Tice v. Amazon.com, Inc.*, No. 19-CV-1311, 2020 WL 1625782, at *1 (C.D. Cal. Mar. 25, 2020) (requiring an individual who did not deny she used Amazon but who used another individual's Amazon account to arbitrate), *rev'd and remanded on other grounds*, 845 F. App'x 535 (9th Cir. 2021); *cf. Stern ex rel. S.S. v. Peloton Interactive, Inc.*, 566 F. Supp. 3d 1019, 1036 (S.D. Cal. 2021) (declining to

enforce an arbitration provision against a minor who "never benefitted from the services provided by Peloton," but was instead harmed by an account holder's "use of Peloton's products and services").

**iv. The Court denies Plaintiffs' request for discovery as to Temu's ability to compel arbitration**

Plaintiffs argue that "discovery would produce further confirmation that this dispute should not be arbitrated." (Pls.' MTC Opp'n 31; *see also* Pls.' Suppl. MTC Opp'n 10.) They argue that "[d]iscovery is necessary so that Plaintiffs have an opportunity to review" and "test" the Trinh declaration's "factual assertions based on undisclosed company 'records' in Defendants' possession." (Pls.' MTC Opp'n 31 (citations omitted).)

Defendants oppose Plaintiffs' request for discovery. They argue that "there is no factual dispute, and in order to decide the motion the Court simply needs to review the Registration [Screen] and arbitration agreement itself." (Defs.' MTC Reply 20.) They also contend that "[t]here is no need to 'test' Defendants' assertions, as Plaintiffs themselves submitted affirmations confirming they are Temu Users . . . and therefore proceeded through the Registration [Screen]." (*Id.* (citation omitted).)

The Court denies Plaintiffs' request for discovery because there is sufficient evidence for the Court to determine that Plaintiffs were on inquiry notice and assented to the arbitration agreement, making additional discovery about whether this dispute should be arbitrated unnecessary. *See Stoll v. JPMorgan Chase Bank, N.A.*, No. 23-CV-4149, 2024 WL 4469174, at *4–5 (E.D.N.Y. July 16, 2024) (concluding plaintiffs agreed to arbitrate after reviewing clickwrap arbitration agreements provided via declarations); *Faith v. Khosrowshahi*, No. 21-CV-6913, 2023 WL 5278126, at *5–6 (E.D.N.Y. Aug. 16, 2023) (enforcing a clickwrap arbitration agreement after reviewing the text of the arbitration agreement the plaintiff assented to); *cf.*

*Aleksanian v. Uber Techs. Inc.*, No. 22-98, 2023 WL 7537627, at *2 (2d Cir. Nov. 14, 2023) (ordering discovery where "the complaint and incorporated documents [did not] provide a sufficient factual basis for deciding the issue" because they omitted facts about whether the appellants were engaged in interstate commerce as required by the FAA (citation omitted)).

Plaintiffs cite one case in support of their request, *Zachman v. Hudson Valley Federal Credit Union*, which is easily distinguishable. In *Zachman*, the district court denied a motion to compel arbitration by reviewing only an excerpt of the arbitration agreement, without a "visual aid or description of any layout or design of the webpages that a user sees when registering for online banking services." No. 20-CV-1579, 2021 WL 1092508, at *2, 7 (S.D.N.Y. Mar. 22, 2021). The Second Circuit vacated the decision because the defendant "did not submit evidence of how the [agreement] was presented to users" and, "[a]s a result, the district court could not resolve whether [the defendant] was on inquiry notice" and was "unable to assess whether the relevant language and hyperlink are clear and conspicuous." *Zachman*, 49 F.4th at 103 (quoting *Zachman*, 2021 WL 1092508, at *7). The Second Circuit explained that "where the parties conducted sufficient discovery and developed an ample record," they have "decided the issues of reasonable notice and objective manifestation of assent as a matter of law," but "have remanded cases where the record was insufficiently developed." *Id.* at 103. In this case, Defendants have provided the Registration Screen, the Terms, affidavits from Temu employees, and Plaintiffs have provided affirmations that they are Temu Users and therefore observed and agreed to the Registration Screen. Thus, there is an "ample record" for the Court to determine that Plaintiffs were on inquiry notice and assented to the arbitration agreement, making additional discovery about whether this dispute should be arbitrated unnecessary. *Id.*

## III. Conclusion

For the foregoing reasons, the Court (1) grants Defendants' motion to dismiss the Non-Users' claims against Temu and PDD based on lack of standing without prejudice; (2) denies PDD's motion to dismiss for lack of personal jurisdiction without prejudice to refile after the parties complete limited jurisdictional discovery, and directs the parties to complete jurisdictional discovery within forty-five days of the filing of this decision and directs Plaintiffs to file a letter within seven days of the close of jurisdictional discovery stating whether it intends to continue pursuing claims against PDD; and (3) grants Defendants' motion to compel arbitration as to the Users' and Minor Users' claims against Temu only and stays the case against Temu pending resolution of the arbitration.

Dated: August 14, 2025
Brooklyn, New York

SO ORDERED:

s/ MKB
MARGO K. BRODIE
United States District Judge